Joseph A. NEFF, Appellant,

v.

**WORLD PUBLISHING COMPANY,** now known as Herald Liquidating Co., a Nebraska Corporation, W. Dale Clark, Peter Kiewit, Peter Kiewit Sons' Co., a Corporation, and World Publishing Company, a Delaware Corporation, Appellees.

No. 17879.

United States Court of Appeals
Eighth Circuit.

July 20, 1965.

Herman Ginsburg, of Ginsburg, Rosenberg, Ginsburg & Krivosha, Lincoln, Neb., for appellant Joseph A. Neff.

Winthrop B. Lane, of Lane, Baird, Pedersen & Haggart, Omaha, Neb., for appellee W. Dale Clark.

Barton H. Kuhns, of Finlayson, McKie & Kuhns, Omaha, Neb., for appellee World Publishing Co. (now known as Herald Liquidating Co., a Nebraska Corp.).

Flavel A. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, Lincoln, Neb., for appellees Peter Kiewit, Peter Kiewit Sons' Co., a corporation and World Publishing Co., a Delaware Corp.

Before BLACKMUN and RIDGE, Circuit Judges, and REGISTER, District Judge.

REGISTER, District Judge.

This is an appeal from judgment sustaining defendants' motions for summary judgment.

For purposes of brevity and clarity, the parties will be referred to hereinafter as follows: Appellant-plaintiff will be called Neff; World Publishing Company, now known as Herald Liquidating Company, will be called World; W. Dale Clark, Clark; Peter Kiewit, Kiewit; and Peter Kiewit Sons' Co., a Corporation, and World Publishing Company, a Delaware Corporation, Kiewit Companies.

Jurisdiction is established by reason of diversity of citizenship and the amount in controversy.

In essence, Neff, by his complaint, alleged that he furnished certain services in negotiating a sale of World's assets at the request of that corporation and of Clark (Chairman of the Board) acting in its behalf, and sought to recover a broker's commission, basing his claim on both an express and implied contract with the appellees for services rendered by him at their request, with the understanding that he (Neff) was to be compensated therefor. Neff alleged the performance of such services; that a contract of sale was duly negotiated and that thereafter appellees breached and refused to perform same but subsequently sold said assets to Kiewit Companies; and that appellees, with knowledge of certain contractual interests and rights of Neff, did "combine, scheme, and conspire to, and each of them did, interfere with the contractual relationship so existing * *" and thereby caused the termination of such contractual relationship and arranged for the sale of World's assets to Kiewit Companies, which actions were done " * * * maliciously and without

cause and with the intent to injure the plaintiff in his contractual rights * * ". Neff alleged liability on the part of appellees for the reasonable value of services rendered by him for the benefit of said appellees.

World and Clark, in their answers, admitted that Clark was, during the time involved, serving as Chairman of the Board of World, and that he did engage in certain negations with a Mr. Newhouse, a resident of New York and the owner of a chain of newspapers, with reference to a possible purchase by Mr. Newhouse of the assets of World. World and Clark further admitted that Mr. Newhouse did submit a written offer or proposal for such purchase but aver that the same was never accepted and that no contract with reference thereto was ever entered into, but that such assets were in fact sold to Kiewit Companies. Said defendants alleged that in such negotiations all services rendered by Neff were solely as the representative and agent of Newhouse, and that there was no agreement that any compensation should be paid by them to Neff, and they denied Neff's allegations with reference to a conspiracy with Kiewit and Kiewit Companies. The answer of Kiewit and Kiewit Companies contained substantially the same allegations as were contained in the answers of Clark and World, and further denied Neff's allegations as to any scheme or conspiracy to interfere with any alleged contractual relationship, or potential contractual relationship, and alleged that in the purchase of World's assets they acted in good faith, without any knowledge of alleged contractual interest or rights of Neff, and denied that such purchase contract was entered into maliciously or without cause or with the intent to injure Neff in any of his alleged contractual rights.

It is apparent, therefore, that Neff's complaint embraces a cause of action for his commission, based upon contract, and also sounds in tort for alleged wrongful interference with claimed contractual rights. The defendants denied all liability to Neff.

Each of the defendants moved for summary judgment on the merits, pursuant to Rule 56, F.R.Civ.P., on the ground that no genuine issue existed as to any material fact and that such defendant was entitled to judgment as a matter of law. In support of their motions defendants offered, and the trial court received, the depositions of fourteen individuals (including Neff, Clark and Kiewit) which were then on file, and separate affidavits of Clark, Walter E. Christenson (Editor of the World-Herald, and President of World Publishing Company), Peter Kiewit, and William A. Cromartie, a lawyer who performed legal services for Kiewit and Kiewit Companies in the matter of the purchase of World's assets. In addition, there were offered and received, in support of said motions, certain interrogatories directed to Neff, and his answers thereto.

Neff offered, in opposition to said motions for summary judgment, his own affidavit (which was received subject to pending motions to strike), specified interrogatories and additional interrogatories of Neff addressed to World and Clark, together with answers thereto, and certain interrogatories (together with answers) propounded by Neff to Kiewit. Those interrogatories and answers not offered by Neff in opposition to the motions were subsequently offered and received on behalf of the movants in support of said motions.

The record before us discloses that this is not the usual case of summary judgment procedure, commonly alluded to as "trial by affidavit". This record, completed after unusually extensive discovery proceedings, includes not only the pleadings and affidavits, but testimony in the form of depositions of all the individual parties, of the lawyers representing such parties and participating in the negotiations involved, and of many other individuals having personal knowledge of the critical facts. Portions of the evidence produced will be referred to in detail as this opinion is developed.

In seeking reversal, Neff contends that the trial court found, inter alia:

(1) that Neff was working for Newhouse only, and anything done by Neff created no obligation to him on the part of any of the defendants;

(2) that no contract ever existed between the defendants and Newhouse, who was represented by Neff;

(3) that Neff has no standing as a third-party beneficiary to enforce any alleged contractual relations;

(4) that Clark owed no legal duty to Neff; and

(5) that Kiewit and Kiewit Companies were not responsible for wrongful interference with any contractual or business relations allegedly existing between Newhouse and other defendants and in which Neff claims an interest.

Neff contends that, in making such findings, the trial Court in effect weighed the evidence and made determinations of disputed issues of material fact. Neff further contends that the trial court erred in certain conclusions of law, the merits of which it is not necessary for us to determine.

The general principles and applicable rule governing these proceedings are concisely stated in the following quotation from the opinion of this Court in Rubenstein v. Dr. Pepper Company, 8 Cir., 228 F.2d 528, at pages 532–533:

"As the judgment appealed from was entered in a summary proceeding we shall first consider the conditions under which a summary judgment may properly be entered. Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A., does not provide for a trial but is in the nature of a preliminary proceeding to determine whether or not there is involved a genuine issue as to any material fact. The proceeding is properly invoked even though the pleadings may on their face present a factual controversy. Durasteel Co. v. Great Lakes Steel Corporation, 8 Cir., 205 F.2d 438; Hurd v. Sheffield Steel Corporation, 8 Cir., 181 F.2d 269. The applicable rule governing these proceedings is thus stated in Durasteel Co. v. Great Lakes Steel Corporation, supra (205 F.2d 441):

'A summary judgment should not be entered unless it clearly appears that there is no genuine issue as to a material fact. Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.; Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213; Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. There may however, be a formal issue presented by the pleadings but shown by affidavit or otherwise not to be genuine. Hurd v. Sheffield Steel Corporation, 8 Cir., 181 F.2d 269; Parmelee v. Chicago Eye Shield Co., 8 Cir., 157 F.2d 582, 168 A.L.R. 1130; Broderick Wood Products Co. v. U. S., 10 Cir., 195 F.2d 433; Dewey v. Clark, 86 U.S. App.D.C. 137, 180 F.2d 766. An issue of fact is not genuine unless it has legal probative force as to a controlling issue, 35 C.J.S., Federal Courts, § 144, p. 1205. The motion for summary judgment is not a trial of the issues but for the purpose of determining whether in fact there are any genuine issues as to material facts. If it is made clearly to appear on such a motion that even though there is an issue under the pleadings there is in fact no dispute as to the controlling material facts, then the court should enter summary judgment.' "

Because of the nature of these proceedings, we have necessarily carefully examined and considered all of the voluminous evidence produced in the trial court.

World, a Nebraska corporation, was engaged in the publishing of The World Herald, a newspaper in the City of Oma-

ha, Nebraska. A wholly owned subsidiary, the Herald Corporation, was engaged in the operation of a television station in Omaha, known as KETV. Subsequent to the occurrence of the events in issue here, World changed its name to Herald Liquidating Company. After his acquisition of the assets of World, Kiewit caused to be created the World Publishing Company, a Delaware corporation, which succeeded to the assets of the Nebraska corporation of that name, and of the Herald Corporation. At the time of the negotiations here involved, the assets of World included not only the newspaper plant and stock in its wholly owned subsidiary, but also approximately ten million dollars in cash and government bonds, and four pieces of real estate (including the building in which the newspaper was published, three other office buildings, and one piece of acreage).

At the time of his death in 1961, and for many years prior thereto, Mr. Henry Doorly and members of his family substantially owned and controlled World. Until July 1, 1960, he had been the editor and publisher of The World Herald. From and after July 1, 1960, Clark was the Chairman of the Board of Directors of World. The total number of outstanding shares of World stock on the critical date was 218,859. On February 2, 1940, members of the Doorly family had placed in trust, under a voting trust agreement, a total of 105,616 shares. This agreement was in effect on October 31, 1962. Clark was not one of the named voting trustees. Clark's wife was a member of the Doorly family. Under the voting trust agreement, the voting trustees had full power and authority, and it was mandatory, "to vote all of said stock as a unit, as in the judgment of said trustees or a majority of them may be in the best interests of all concerned, at all meetings of the stockholders * * * and upon any and all matters or business and questions which may be brought before said meetings, specifically including the question of the sale of the World-Herald, or any part or all of the assets of the World

Publishing Company, as fully as any and all of the undersigned stockholders could do if personally present".

Neff resided in New York City where he was engaged as a business broker. Prior to the events involved in this action, he had never been associated with, or represented, a newspaper owner or publisher in connection with the sale of a newspaper. Neff had a business and social acquaintanceship with Samuel I. Newhouse, also a resident of New York City, and the owner of several newspapers. After learning of the death of Mr. Doorly in the fall of 1961, Neff made inquiry of Newhouse as to whether he would be interested in the purchase of World. Newhouse's answer was in the affirmative. Neff thereupon called a business friend in Omaha (Mr. Morris Jacobs) and inquired if he knew the person to talk to with reference to a possible sale of the newspaper. Jacobs gave Neff the name of Clark. Neff telephoned Clark and told him he desired to talk with him about the possible purchase of World. Clark replied he knew of no interest on the part of anybody for such a sale, but informed Neff he (Clark) would be coming to New York City and arrangements were made for a meeting there on June 28, 1962. This meeting was held in Neff's apartment, and was the first time Clark ever met Neff. Prior to Neff's telephone call to him in Omaha, Clark had never heard of Neff. Also, prior to said telephone call, in April, 1962, Mr. Newhouse asked Neff to contact Clark and authorized him (Neff) in his behalf to offer thirty-five million dollars for World. Neff informed Mr. Newhouse of the telephone conversation with Clark and of the arrangements for the pending meeting. Newhouse told Neff "I will pay you the commission in addition to that so the gross price, the cost of the paper, will include, my cost will be the thirty-five million plus the commission". At the June 28 meeting Neff informed Clark that he was representing Newhouse, that Newhouse had an interest in the possible purchase of World, that he (Neff) was authorized by Newhouse to submit an

offer of thirty-five million dollars and that there would be no fee or commission as far as World or its stockholders were concerned. Clark thereupon informed Neff that he knew of no interest on the part of the owners to sell. In August, 1962, Neff wrote to Clark again inquiring as to whether at that time there was any interest to sell; Clark replied in the negative.

On September 25, 1962, Clark met with Neff and Newhouse in the latter's apartment in New York City; this meeting was pursuant to a telephone request made by Neff to Clark in Omaha the previous day. This was Clark's first meeting with Newhouse. Only Newhouse, Neff and Clark were present. Newhouse informed Clark of his interest in World and discussed in general its approximate assets and earnings, and informed Clark that he had authorized Neff to make the offer of thirty-five million dollars. Clark asked Newhouse if Neff was his authority solely, and Newhouse replied in the affirmative. Newhouse informed Clark that if any business was done, the stockholders would have no obligation to Neff, that "He is my representative". Neff was present, heard Newhouse's statement, nodded his head affirmatively, and said, "That's right". Newhouse desired additional detailed information and figures, and asked if he could come to Omaha the next Monday (October 1) for that purpose. The suggested date conveniently fitted into a previously scheduled trip. Arrangements were thereupon made for a meeting at Clark's office in Omaha. Upon his return to Omaha, Clark telephoned Neff and suggested that the meeting be held in a hotel instead of in his office. At the agreed time and suggested place, Newhouse, his two sons, and Neff arrived. At that meeting, and at the request of Newhouse, Clark gave to him for examination financial statements of World for the preceding three years. Also at the request of Newhouse, Clark submitted operating figures of two of the office buildings owned by World. After Newhouse and his sons examined the information furnished them, and after

some discussion during which Clark stated he did not think the bid was high enough, Newhouse informed Clark he would raise his bid and was willing to pay one hundred and eighty-two dollars per share. Newhouse thereupon submitted to Clark a written proposal. This instrument is in the handwriting of Newhouse dated "Oct. 1, 1962", signed by Newhouse, directed to "Mr. Dale Clark—Chairman", and in part states: "Confirming conversation I propose to buy approximately 80% of the issued stock of the World Publishing Company at a price of $182 per share in cash. This offer is limited to acceptance within 10 days." At the meeting on October 1, no reference was made to Neff's compensation. After Newhouse submitted the written offer, Clark informed him he would submit it to the other officers of the corporation and would inform the principal stockholders. This was done. Those contacted indicated surprise at the offer, but also indicated a general willingness that Clark pursue the matter, with the exception of Mrs. Hitchcock (one of the principal stockholders) who objected to any sale. Mrs. Hitchcock was the widow of the founder of the paper, and owned 54,000 shares (approximately one-fourth of the total number outstanding) of the corporate stock. She had retained authority to vote her stock.

On October 6 Neff telephoned Clark and reminded him of the rapidly approaching expiration date of the offer, and inquired as to what Clark was doing. Clark replied that there were complications, that "the paper was loaded with feminine ownership", that the owners "were all full of ideas and opinions and I didn't know just where the thing was", but would call him back that afternoon. This he did, and Clark told Neff that, if agreeable, he would come to New York "to try to formalize this thing and put it into some contractual shape". He suggested that a time be set which would be agreeable to Neff and Newhouse. Neff subsequently telephoned Clark and Monday, October 8 (a date previously suggested by Clark) was fixed as the time for

a meeting, to be held in the office of Mr. Goldman, Newhouse's lawyer.

At the time and place that had been agreed upon, Clark, accompanied by his lawyers, Kuhns and Lane, met with Neff, Newhouse and Goldman. While the lawyers were discussing the legal problems involved, Clark and Newhouse conversed. Clark informed Newhouse, as he had informed Neff, of the feminine ownership of World, of the owners' "independent minds", of Mrs. Hitchcock's adverse position, and of the possible favorable effect upon the owners of an increase in the offer of $1.25 per share to cover an expected dividend. Newhouse advised Clark he would raise his offer to $183.25 per share. However, the lawyers concluded that, because of certain FCC regulations and tax consequences, it would be "impossible to go the per share stock route", but that a sale could be effected by a sale of the assets.

The following evening Clark returned to Omaha, leaving his lawyers "to finalize the points that were not yet cleared, and if those were cleared satisfactorily it was the intent that they would bring home the proposal which Mr. Newhouse would sign". Clark instructed his lawyers to telephone him if the proposal was finally completed, or "if it fell down". Clark did receive a call from his lawyer Kuhns, who advised him that the document had been completed and signed by Newhouse. Clark thereupon informed Newhouse of arrangements for a meeting of the Board of Directors to be held on October 12 (a procedure discussed by Clark and Newhouse during their last New York meeting) and Newhouse requested Clark to make hotel arrangements for him in Omaha. The following day Clark's lawyers returned to Omaha with the completed and signed proposal.

Before Clark left New York City, there had been discussion in the group concerning certain statutory requirements of the State of Nebraska regarding corporate action, and to the effect that no final commitment could be made until after a decision had been reached by the corporate stockholders to liquidate.

Clark stated he would use his best efforts to get the proposal accepted. It was understood that the directors had to meet first, pass a resolution of liquidation for the approval of the stockholders, and call a stockholder's meeting. The document signed by Newhouse provided that a director's meeting be called for October 12 and a stockholder's meeting for October 26.

Newhouse and his two sons attended the meeting of the Board of Directors on October 12. At that meeting Clark "emphasized that he was acting only as intermediary and had no authority to commit the stockholders". Newhouse made a statement to the Board with respect to his acquisition of newspapers, and his general policy. Kuhns informed the Board that "there has been no sale, and that no contract has been made, and that no contract will be made unless and until a plan of liquidation looking to the disposition of the assets of the corporation has been adopted by both the directors and the stockholders". Director Kountze requested an extension of time to study the proposal. Thereafter the guests withdrew and the meeting was recessed until that afternoon. During the recess Clark secured from Newhouse his consent to a delay of one week as to the directors meeting and five days delay as to the stockholders meeting. Such changes were initialed by Newhouse on the proposal. That afternoon the Board met, only to adjourn until October 19.

On October 19 the Board of Directors again met. At that meeting a resolution was adopted which provided in part that "the following plan of complete liquidation of the World Publishing Company * * * shall be effective upon the adoption and approval of the Plan at a special meeting of the stockholders, by an affirmative vote of the holders of record of a majority of the outstanding stock of the corporation * * * ". Also adopted at the meeting was a resolution which provided:

"BE IT RESOLVED, that in the event the stockholders of the World Publishing Company, at a special

meeting of the stockholders to be held on October 31, 1962, approve the plan of complete liquidation of this corporation as adopted by the Board of Directors at their meeting on October 19, 1962, and subject to the ratification of this resolution by the stockholders, the Chairman of the Board of this corporation shall be and hereby is authorized and directed to accept the proposal of Samuel I. Newhouse dated October 10, 1962, for the purchase of all of the assets of this corporation except cash, marketable securities, and stock of the Herald Corporation, and to do all things necessary to consummate the proposal, including the execution of all instruments of conveyance or assignment necessary therefor, and to deliver the same to the purchaser on payment of the purchase price."

A similar resolution was adopted with reference to Newhouse's proposal to purchase the capital stock of the Herald Corporation.

On October 12, in Denver, Colorado, Kiewit first learned of the pending negotiations for the sale of World to Newhouse from a news item which appeared in that day's issue of the Wall Street Journal. He became interested in such a purchase as an investment opportunity, and on October 29 submitted a written offer for the purchase of World's assets. At the stockholders meeting on October 31, the Newhouse proposals and the Kiewit offer were submitted for their consideration. At that meeting the stockholders adopted the plan of liquidation, unanimously rejected the Newhouse proposals, and unanimously accepted the Kiewit offer. Thereafter the sale to Kiewit was consummated.

## CONTRACT

By this action Neff seeks payment of a commission which he claims is due him. He makes no claim that any of the defendants agreed to pay him any compensation. However, he contends that a genuine issue of fact exists regarding his claimed right to recover from World "for services rendered".

The only person in any way connected with World with whom Neff had any dealings was Clark. Neff's first call to Clark was made at the request of Newhouse, who had previously authorized Neff to submit a specific offer for the purchase of World. After this first telephone conversation with Clark, Neff advised Newhouse of the planned meeting. Thereupon Newhouse informed Neff that he should make a "firm offer" and that he, Newhouse, would pay Neff's commission in addition to the sum offered. At the September 25 meeting (at which Neff, Clark and Newhouse were present) Clark said to Newhouse: "There's another thing I want to ask you, are you paying the commission to Joe Neff?", and Newhouse replied: "I will pay Joe Neff the commission in addition to the thirty-five million, * * *". The amount of the commission was never discussed in Clark's presence. The only other time Neff's commission was mentioned in the presence of Clark was on October 1 in Omaha. After an increased offer had been discussed between Clark and Newhouse, Clark inquired of Newhouse: "Now again about the commission, you are paying the commission?", to which Newhouse replied: "I'm paying Joe Neff the commission in addition to the price that we have agreed upon of $182. a share". This conversation was had in the presence of Neff. Clark never made any statement about the payment of any compensation by him or by World to Neff.

Until the October 8 meeting in New York City, all of the discussions had were in regard to the purchase by Newhouse of capital stock of World, as originally formalized in his written proposal of October 1. On October 8 this proposal was abandoned and the subsequent discussion was in regard to the liquidation of World and the purchase by Newhouse of the assets. After the negotiations had shifted to the purchase of assets rather than stock, there was no change in the arrangement as to Neff's representation of

Newhouse or as to the compensation to be paid Neff by Newhouse. The facts as referred to so far under this heading are not only undisputed, but are in substance as testified to by Neff himself in his deposition.

We find it impossible to glean from this voluminous record any facts upon which Neff can base a claim against World "for services rendered". In his affidavit, Neff states that "On September 24th I called Mr. Clark and talked to him * * * and made the appointment for Mr. Clark to meet Mr. Newhouse and myself the next day". This undisputed fact is emphasized in Neff's brief. However, another portion of Neff's deposition, which is also undisputed, establishes that before this first telephone call to Clark, Neff had talked with Newhouse and that the latter "asked me to contact Mr. Dale Clark in Omaha" and authorized Neff to make an offer to purchase. Neff's diary memorandum on this point was that "Sam asked I contact Omaha and offer 35 million and plus. If books or figures showed both worth more, prepare to pay it". Upon reporting to Newhouse that he had made arrangements for meeting Clark the next day, Neff received further instructions (from Newhouse) as to the offer he should make, and was told specifically that Newhouse would pay Neff's commission in addition to the purchase price. It clearly appears, therefore, that in calling Clark and making arrangements for the September 25 meeting, Neff was acting solely as the agent and representative of Newhouse. In his affidavit Neff further asserts that at the September 25 meeting Clark suggested that Neff and Newhouse come to Omaha the following Monday at which time "he would present additional financial statements and figures for the preceding year's business, about which Mr. Newhouse had inquired". It is undisputed that Clark attended the September 25 meeting at the request and invitation of Neff, acting on behalf of Newhouse; that this was the first meeting between Clark and Newhouse; that prior thereto Newhouse had advised Neff that he would raise his offer if the figures jus-

tified it; and that at that meeting Clark did not have the financial information desired by Newhouse. Clark, in his affidavit, states that Newhouse asked for permission to come to Omaha, and there to have submitted to him pertinent financial records, and that such meeting be on the following Monday in order to accommodate his (Newhouse's) schedule. We believe any dispute as to these details to be wholly immaterial. It is obvious that the first Omaha meeting was held with the consent of both Clark and Newhouse to enable the latter to secure sufficient information upon which to base a written offer. In the interrogatories directed to, and answered by, Neff, appear the following interrogatory and answer: "What was the subject matter of the sale to be discussed at Omaha?" ; "Mr. Samuel I. Newhouse was to examine the property and to meet the Board of Directors, and then make a formal offer." Whatever was done by Neff in connection with making hotel reservations for Newhouse and his sons, and answering telephone calls by Clark with reference to the Omaha meeting, was obviously done pursuant to the relationship then existing between Neff and Newhouse. The testimony of Neff as to the facts upon which he bases his claim that he is entitled to compensation from someone other than Newhouse for "services rendered" appears in his deposition, and some reference thereto is also made in his affidavit. In his deposition, after stating that Clark had inquired of Newhouse at the September 25 meeting as to payment of a commission to Neff, and Newhouse's reply that he would pay it, Neff said: "Mr. Clark asking us to make hurried trip to Omaha within seventy-two hours, and from the statements made there, I gathered that I was then acting with the full consent of both Mr. Clark and Mr. Newhouse." The "statements" referred to in this quotation were made during a discussion which was preliminary to the possible submission by Newhouse of an offer to purchase certain capital stock of World which was then owned by individual stockholders. Any action taken by Neff in this regard

was in pursuance of his agreement with Newhouse, as sole representative of Newhouse, and with the express understanding Neff's commission would be paid by Newhouse, and that the stockholders of World would have no obligation to Neff. Such an offer was subsequently made. It was not accepted within the time limitation specified by the offeror and was, in fact, abandoned. No liability can be imposed on World for such "services" allegedly performed by Neff.

Neff states, in his affidavit, that he received a call from Clark on October 6 whereby he was informed that it "was very important that a meeting be set up immediately with Mr. Newhouse", and that he was requested to "set it up" on October 8 and arrange that Newhouse and his lawyers be present. Undoubtedly the purpose of such statement is to indicate this "service" was performed at the request of and on behalf of the proposed seller. However, the undisputed facts disclose that prior to that call, and in the forenoon of the same day, Neff had telephoned Clark and asked him ".* * * what we were doing or how we were getting along," and reminded Clark that Newhouse's written offer would expire in four days. In that telephone conversation, after Clark told Neff of the difficulties he was having with the owners of the stock, Clark promised to call Neff later that day. This was done, and it was during this call that Clark suggested that he and his lawyers would go to New York and meet with Newhouse and his lawyers on October 8. The undisputed facts as to this portion of the negotiations clearly establish, therefore, that the communication by Clark to Neff was pursuant to the latter's request, in connection with Newhouse's written offer, and was made to Neff as the representative of Newhouse. We have carefully considered the entire record as to all other "services" allegedly performed by Neff upon which recovery on a quantum meruit theory could be based and not only find no facts or circumstances from which a promise to pay can be implied, but that such facts and circumstances completely negate such implication.

In support of his contention that a genuine issue of fact exists concerning his right to recover for alleged services rendered, Neff submits two general propositions of law. (1) "Where a broker renders services for another under such circumstances as to indicate that he expects to be paid, and the person for whom such services are rendered permits the broker to so act with knowledge thereof and accepts the benefit thereof, the broker is thereby entitled to recover from such party for such services." In support of this rule of law, Neff cites, inter alia, Schimmelpfennig v. Gaedke, 223 Minn. 542, 27 N.W.2d 416. (2) "A broker who has rendered services in negotiating a sale at the request of a party can recover for the loss sustained by reason of the refusal of the recipient of such services to perform as promised." Among the cases cited in support of this rule is Calkins v. F. W. Woolworth Company, 8 Cir., 27 F.2d 314. This opinion would be unduly extended were we to discuss each of the cases cited. Suffice to say, we are in complete agreemnt with the rules stated, which are well established and generally accepted. However, the facts existing in the cited cases are readily distinguishable from those in the case before us, and it clearly appears that neither of the general rules referred to is applicable herein.

The facts in this case are closely analogous to those found in Humpe v. Taylor, 119 Neb. 33, 226 N.W. 912. Plaintiff therein was a real estate broker, employed by and acting on behalf of a trust company in procuring an option from the defendant property owner, for the benefit of the Standard Oil Company. The court held, as a matter of law, that plaintiff was not entitled to a commission from the vendor, and stated that the record disclosed that what plaintiff did was in the performance of his obligations and duties in representing the trust and oil companies, and hence was disqualified to

act for the vendor. The court concluded, at page 913:

"A broker will not be allowed to recover from a proposed vendor a commission for broker's services where, at the time of the alleged service, he was disqualified to act for the vendor. A broker's commission cannot be recovered from a vendor where the evidence discloses that the only service rendered was for the vendee."

In Dobson v. Wolff, et al., 74 S.D. 493, 54 N.W.2d 469, at page 471; the Supreme Court of South Dakota stated:

"A broker effecting a sale of property can recover a commission only by virtue of a contract, express or implied, with the principal."

■ The record before us establishes, as a matter of law, that Neff's principal was Newhouse, and that the only contract, express or implied, with reference to the payment of a commission or compensation to Neff, was that which existed between Neff and his said principal. It is conceded by Neff that there were no express words on the part of Clark or any of the defendants upon which a contract to pay compensation can be established. The record fails to disclose any evidence of conduct on the part of Clark or the other defendants upon which such a contract can be established by implication. There are no facts of record which indicate a contemplation of the assumption of legal rights and duties necessary for the creation of an actionable contract as between Neff and World, or Neff and Clark.

Neff also contends that there is an issue of material fact concerning whether he has a cause of action upon the basis of a contract created and existing between World and Newhouse, of which he is allegedly a beneficiary.

All parties concede that the instrument dated October 1, 1962, was an offer only. Therein Newhouse stated " * * I propose to buy approximately 80% of the issued stock of the World Publishing Company * * * ", and "This offer is limited to acceptance within 10 days".

Clearly, this was merely an offer to buy stock at a stated price and for a limited period of time. As Newhouse fixed a specific period of time (10 days) in his offer within which acceptance must have been made, the power to create a contract by acceptance thereof terminated at the time specified in such offer. See: Restatement of the Law, Contracts, Section 40. This offer and method of proposed purchase contained therein were abandoned at the meeting commencing on October 8. It is undisputed that there was no acceptance of this offer.

Neff contends that the negotiations involving a plan of liquidation of World and sale of its assets did ripen into a contract at the October 8 meeting, and that his commission was earned on October 9. A portion of Neff's deposition reads as follows:

"Q. * * * You do not feel that Mr. Newhouse owes you any commission?

A. At this time?

Q. Yes; is that right?

A. That's correct.

Q. And you do not intend to make any claim against Mr. Newhouse for a commission?

A. That's correct.

Q. And you have received no compensation from Mr. Newhouse?

A. Correct.

Q. And yet I also understand you, and again I don't want to misquote you, that your commission was, in fact, earned on October the 9th in New York?

A. That's correct."

This testimony is consistent with Neff's position that a contract came into existence on October 9 between Newhouse and World. In Neff's deposition, the following appears:

"Q. * * * before October 9th there was no agreement between anybody before October 9th?

A. No, there was an offer up to that time.

Q. Yes, but no argeement?

A. Thata's right."

In support of his contention that a contract came into existence at that meeting, Neff places great reliance upon certain statements allegedly made there by Clark. Neff states, in his affidavit, that on October 8, in the presence of the lawyers representing Newhouse and Clark, Clark stated that he had proxies from the members of the Doorly family, and that later, in another room where he and Clark were alone, Clark stated to Neff, "I already have the proxies from 67 to 70 percent of the stockholders". Neff further states, in effect, in his affidavit that early the following morning (October 9) the lawyers for Clark and Newhouse continued their discussion concerning the drafting of the proposed written instrument to be submitted by Newhouse and that during such discussion Newhouse's lawyers stated that they would not permit Newhouse to sign any offer which would be subject to competitive bidding by others and which would bind Newhouse but could be rejected by the other party. Further, that they would not permit Newhouse to sign any agreement unless they were first assured that the transaction would be binding upon all parties; that Clark told Newhouse and his lawyers they need have no fear in that regard, that he had in his pocket proxies from more than 67 per cent of the stockholders, and that he was authorized to speak for them; and that when a satisfactory draft of an agreement of sale was completed by the lawyers and approved by Clark, Newhouse and his lawyers would then have the assurance that the sale would be approved by more than 67 per cent of the stockholders. Clark, in his affidavit, denies that he had any such proxies or such authority from any of the stockholders, and denies that he made the statements attributed to him by Neff.

In his deposition, Neff testified that during a conversation between Clark and Goldman early in the meeting on October 8, Goldman stated he was opposed to proceeding as suggested because it had been his experience that people used such proposals "for a matching purpose to gain better bids"; that thereafter Clark said: "I represent 67 to 70 percent and I will vote it, and this is a deal.", whereupon Goldman said: "On that basis then I'll go ahead". Further on in his deposition Neff testified that he did not know what the "deal" referred to was, as he had not been present during the discussions between Clark and Goldman' and does not know whether, at that time, any of the terms of the final proposed agreement had been reached. Clark denies the making of such statements.

Neff contends that "the clash" between his own deposition and affidavit, and Clark's affidavit, demonstrates there exist issues of material facts. In our opinion these disputes do not involve or place in issue material facts.

At the time Clark's statements above referred to were allegedly made, it had been decided that the method proposed in the then existing offer (purchase of stock) should be abandoned, because of unfavorable tax consequences that might result therefrom, and due to certain anticipated licensing problems with FCC involving the television station constituting a part of the corporate assets. It is undisputed that the first time the alternative plan (sale of assets following liquidation of the corporation) was discussed was at the meeting on October 8. Obviously, the plan or procedure then being worked out by the respective lawyers, as a basis for Newhouse's proposal, was unknown to the stockholders at that time. Too, there had been no discussion between Clark and any of the directors or stockholders of World concerning the possible sale of corporate assets, prior to Clark's departure for New York City and the October 8 meeting. During the discussions then under way, the requirements of the Nebraska statutes regarding sale of corporate assets were considered. Such statutes provided that a sale of corporate assets could not legally be consummated until the stockholders of the corporation approved it at a meeting held for such purpose, or con-

sented to it in writing.[1] Had any signed proxies been in the possession of Clark at that time, they would not have constituted such "written consent" as contemplated by the statute. Furthermore, any statements so made (if in fact they were made) by Clark to Goldman were made at a time Goldman was considering whether or not to prepare a written proposal for the signature of Newhouse. If made, such statements of Clark were made in the course of discussions which constituted a part of preliminary negotiations intended to lead up to, and leading up to the formal, written proposals signed by Newhouse. As was said by this Court in A. E. Staley Mfg. Co. v. Northern Cooperatives, Inc., 8 Cir., 168 F.2d 892, 895: "An invitation to enter into negotiations is not an offer which may be accepted and thereby create a contract. Preliminary negotiations between parties who have in mind the execution of a formal written contract can not themselves be construed as constituting the contract. (Citations) In the law of contracts the intent of the parties must be looked to and a contract is not made so long as both parties anticipate that something remains to be done to establish contractual relations. * * *"

██ The proposals, as prepared, embodied the terms and conditions prescribed by the offeror (Newhouse), and which might or might not be accepted by the other party (World), and which might or might not become a part of a final contract. At that time negotiations were still in progress. One of the essential elements of a contract is "mutuality of agreement" or "mutual assent" —frequently referred to as a "meeting of the minds" of the parties. In Joseph v. Donover Company et al., 9 Cir., 261 F.2d 812, at page 820, the Court said:

"To create a contract, then, the minds of the parties must meet as to every essential term of the proposed contract, and there must be a clear and unequivocal acceptance of a certain and definite offer in order that a mere agreement may become a contract. Therefore, it is necessary, among other things, that the minds of the parties meet as to the essential terms of the proposed contract."

Also see: Corbin on Contracts, Vol. 1, Section 107.

Neff argues that "the meeting in New York on October 8th, 9th and 10th had finalized the agreement between the parties" and "that there had been a satisfactory meeting of minds at the meetings in New York". The portion of the record cited by Neff in support of this contention is Clark's deposition. It is undisputed that Clark left that meeting on the evening of Tuesday, October 9. The deposition itself shows that Clark's answer to a question concerning the condition of the draft when he left was that "there might have been certain sections of it that were pretty finalized by Tuesday evening * * *". The following testimony sheds some light on this point:

"Q. Well, in other words was it your feeling that you and Mr. Newhouse had agreed on everything that there was for you gentlemen to pass on?

A. We had a pretty satisfactory meeting of minds, yes, sir.

* * * * * *

Q. And what was said about your leaving and Mr. Kuhns and Mr. Lane remaining?

A. They were to finalize the points that were not yet cleared, and if those were cleared satisfactorily it was the intent that they would bring home the proposal which Mr. Newhouse would sign."

This testimony not only fails to support Neff's contention, but clearly establishes that at the time of Clark's departure, only "certain sections" of "the draft" had been "pretty finalized", and that after such points had been "cleared", the completed draft was intended to constitute a "proposal", intended to be signed and submitted by Newhouse.

---

1. Neb.R.R.S. 21-1,113, 1961 Supp.

The written instruments finally drafted and signed by Newhouse (the fruit and culmination of the discussion of the parties and of the advice and efforts of counsel) are doubtless the best evidence of the character of the negotiations and intentions of those participating, and merit careful consideration and analysis. Neff contends that said instruments constitute a " * * * valid and binding contract of sale" between Newhouse and World, "without condition".

The basic instrument (all are attached to Neff's complaint) is designated Exhibit A. This exhibit is in the form of a letter directed to World Publishing Company at its Omaha address, dated October 10, 1962, and is signed by Newhouse. The preface to the body of the letter states: "in the event of your adoption of an appropriate resolution for such reorganization and complete liquidation on or before October 26, 1962, the undersigned makes the following proposal: * * * ". Paragraph 1 states: "Subject to the terms and conditions hereinafter set forth, the undersigned will purchase from you * * * ", following which appears a description of the assets. Paragraph 3 commences: "This offer is made subject to and upon the following terms, condi-tions, warranties and representations: * * * ", following which are expressed specific terms, conditions, etc. Paragraph 9 states: "As a condition to the purchase hereunder, it is understood that your Company and its stockholders shall take all steps necessary and appropriate in connection with the reorganization and liquidation of the corporation and the acceptance of this proposal, and * * * ". Paragraph 12 provides that: "The closing of the sale hereunder shall take place at the offices of the Corporation, at 14th and Dodge Streets, in the City of Omaha, Nebraska within ten (10) days after the completion of all corporate action required on the part of the Corporation to authorize the consummation of this sale, * * * ". Paragraph 17 commences: "Upon acceptance of this proposal, you undertake and agree to * * * ". Paragraph 18 states: "If you duly adopt a Resolution of Liquidation, your signing of the Acceptance at the end of this proposal shall constitute this proposal as a binding contract on all parties effective as of the date of acceptance; otherwise this proposal shall be null and void." Following the signature of Mr. Newhouse, there is set out:

### "ACCEPTANCE OF PROPOSAL

The undersigned WORLD PUBLISHING COMPANY hereby accepts the above proposal and agrees to be bound by all the terms and provisions thereof.
DATED , 1962.

 WORLD PUBLISHING COMPANY
 By ......................
 President

ATTEST:

.........................
 Secretary"

---

Exhibit B is a similar document of same date, directed to the same addressee, and signed by Newhouse. It contains the same preface as Exhibit A, and proposes the purchase of 700 shares (40%) of the capital stock of the television company. Paragraphs 4, 5 and 6 commence, respectively: "If this proposal is accepted, the Herald Corporation and the undersigned shall each proceed * * * "; "On acceptance of this proposal and * * * "; and "As a condition to the

purchase hereunder, it is understood that * * * ". Paragraph 7 refers to the closing of the sale within a stated time after completion of "all corporate action required on the part of the corporation to authorize the consummation of this sale". Paragraph 9 provides that: "Effective upon the acceptance of this proposal, the World Publishing Company represents, warrants, covenants and agrees * * * ". After the signature of Newhouse there appears the same form of acceptance for execution by World as appears in Exhibit A. Following that form is a "guaranty" in this language:

"If the attached proposal is accepted by the World Publishing Company I hereby guarantee the full performance thereof by Newhouse Broadcasting Corporation.

Dated October 10, 1962.

Samuel I. Newhouse."

Exhibit C is a letter dated October 10, 1962, directed to World at its Omaha address and signed by Newhouse. It commences:

"We are concurrently herewith submitting to you a proposal to buy Seventeen Hundred Fifty (1750) shares of the capital stock of the Herald Corporation, your wholly owned subsidiary. In submitting this offer we consent that you may take the following actions and the same shall not affect our proposal:

* * * ."

Exhibit D is a letter dated October 10, 1962, but addressed to Charles Goldman, Esquire (Newhouse's lawyer), and signed by Barton H. Kuhns (one of World's counsel). It commences: "In connection with the proposals which are being submitted * * *, please be advised as follows: * * * ". Exhibit E, also a letter from Kuhns to Goldman, and bearing the date of October 10, is prefaced by: "In connection with the proposals which are being submitted to the World Publishing Company with respect to the sale of the assets of the World Herald, including the Television Station KETV, please be advised as follows: * * * ".

This document (Exhibit E) bears the notation: "Supplemental Letter of Intent".

Exhibits C, D and E have been referred to by counsel as "letters of intent", and were prepared and signed after the drafts of Exhibits A and B had been completed on October 10. Obviously their purpose was to clarify and explain certain provisions of the formal documents.

■ Certain factual background must be kept in mind. Clark was Chairman of the Board of Directors of World, and had been for many years a Director of that corporation. He was a substantial, experienced businessman, and had recently retired from an extensive period of employment with the Omaha National Bank. Lane and Kuhns were experienced lawyers, personally selected by Clark to accompany him to New York to participate with him in the anticipated negotiations and to advise him in connection therewith. Newhouse was also an experienced and substantial businessman. He was the owner of numerous newspapers. He was the possessor of the maximum loan credit (45 million dollars) at the Chemical Bank and Trust Company of New York. Clark and Newhouse and their respective counsel knew the negotiations involved the entire assets of World and that, if a purchase and sale were consummated, the cash consideration would be in excess of forty million dollars. It is incredible to attempt to give the instruments referred to any legal significance other than as appears on their face. As previously stated, Exhibit A is the basic document; the words "offer" and "proposal" are used throughout. The very making of the "proposal" was, by its express words, to be so considered only "in the event of your adoption of an appropriate resolution for such reorganization and complete liquidation". The "offer" is subject to many specific terms and conditions—all of which had not been "finalized" at the time of Clark's departure from the meeting on October 9—and some of which were, after the final draft, clarified and explained by "letters of intent". One of the express terms or con-

ditions stated is the taking and completing of all necessary corporate action authorizing the proposed sale.[2] The offeror stated specifically, in plain and unambiguous language, with words chosen by the offeror or his lawyer, that "If you duly adopt a Resolution of Liquidation, your signing of the Acceptance at the end of this proposal shall constitute this proposal as a binding contract on all parties effective as of the date of acceptance; otherwise this proposal shall be null and void". It is undisputed that the Acceptance was never executed by World, was never signed by its President, or attested to by its Secretary. World did not comply with or fulfill the stated conditions. There was no acceptance of the proposal and it did not ripen into a contract, but by virtue of its express terms became "null and void". This is also true as to the proposal designated Exhibit B. In Exhibit D it is stated that "It is understood that neither proposal shall be accepted without the other".

"It is elementary law that in order to prove an express contract, a definite offer, and an unconditional and absolute acceptance thereof, must be shown". Beskas v. Calkins, 135 Neb. 323, 281 N.W. 29, cited with approval in Wilkie v. Banse et al., 166 Neb. 138, 88 N.W.2d 181, 185.

In Kline v. Metcalfe Construction Co. et al., 148 Neb. 357, 27 N.W.2d 383, at page 386; the court stated:

"As stated in 17 C.J.S., Contracts, § 42, p. 378: ' * * * the offerer has a right to prescribe in his offer any conditions as to the time, place, quantity, mode of acceptance, or other matters which it may please him to insert in and make a part thereof, and the acceptance, to conclude the agreement, must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand, and, in the absence of such an acceptance, subsequent words or acts of the parties cannot create a contract.' "

To the same effect, see: Anderson et al. v. Stewart, 149 Neb. 660, 32 N.W.2d 140, 3 A.L.R.2d 250 (in which the court quoted with approval from 55 Am.Jur., Vendor and Purchaser, Sec. 16, page 483), and Canton Cotton Mills v. Southwest Overall Co., 8 Cir., 8 F.2d 807.

Neff argues that no legal significance should be attached to the fact that the proposals were not signed by the officers of World, and cites in support of this argument Utilities Insurance Co. v. Stuart et al., 134 Neb. 413, 278 N.W. 827. For our purpose it is unnecessary to comment upon the facts in that case. The court therein referred, at page 830, to an instruction by the trial court as being "in harmony with a well established rule of law that, in the absence of some statutory requirement or *specific agreement that a contract is not to be effective until signed,* assent thereto may be shown in other ways as by delivering the contract and acting under it". (Emphasis added.) However, Newhouse, in his written proposal, could (and did) impose specific terms as a condition precedent to the formation of a binding contract.

Neff also argues that there is a genuine issue as to whether in fact more than 70% of the stockholders approved Newhouse's proposal. We point out, however, that such proposal, by its express terms, required "as a condition to the purchase hereunder, it is understood that your company and its stockholders shall take all steps necessary and appropriate in

---

2. Section 21–1,113, Neb.R.R.S., 1943, provides, in part, after authorizing the sale of assets, as follows: " * * * Provided, that such mortgage, sale, lease or exchange must first be authorized or later be approved by the affirmative vote of the holders of a majority of the voting stock issued and outstanding given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding; * * * ".

connection with the reorganization and liquidation of the corporation and the acceptance of this proposal * * *". Nebraska law (see footnote 2) permits a sale of assets such as proposed *only with the written consent of the holders of a majority of the outstanding voting stock, or by majority vote of such stockholders voting at a meeting called for the purpose of considering such sale*. It is essential that the statutory requirements be complied with before a binding contract can be entered into. See: Michigan Wolverine Student Co-Operative, Inc. v. William Goodyear & Company, 314 Mich. 590, 22 N.W.2d 884, 890. It is undisputed that no such consent was secured from Mrs. Hitchcock, owner of approximately 25% of the voting stock, who was unalterably opposed to a sale to Newhouse. The voting trust (embracing 105,616 shares, or approximately 48% of the outstanding voting shares) specifically restricted the voting of such stock to such action "at all meetings of the stockholders", and was required to be voted as a unit. Neff makes no claim that any proxies (which he chooses to interpret, arguendo, as being "written consent" required by the statute) were ever signed for the voting trust. The record establishes without doubt that this particular condition of the offer by Newhouse was not accepted, but was specifically rejected at a meeting at which a majority of the stock was represented in person. The conditions set forth in the proposal by Newhouse are clearly conditions precedent to the creation of a contract obligating World. They are not merely conditions precedent to the enforcement of an existing contract.

Throughout his amended complaint and brief, Neff uses the term "defendants" without specifying the particular defendant or defendants referred to. Insofar as the "contract" (as distinguished from the "tort") aspect of this case is concerned, it is clear that there is no genuine issue of a material fact insofar as Kiewit or Kiewit Companies are concerned. It is undisputed in the record that the first time Kiewit knew of the possible sale of the assets of World, or became interested in the purchase of such assets, was on October 12 when he read the news item appearing in the Wall Street Journal relative to negotiations between World and Newhouse. When asked (by interrogatories) what connection Kiewit or Kiewit Companies had with the negotiations and alleged contract for his services, Neff replied "Unknown to plaintiff". When asked how and in what manner Kiewit or Kiewit Companies agreed that the plaintiff was to be compensated for his services, Neff replied "unknown to the plaintiff". Neff's reply to these same questions with reference to World Publishing Company, a Delaware corporation, was "World Publishing Company, a Delaware corporation, was not in existence at that time". When asked what parties understood and agreed that he was to be compensated for his services in event of an agreement, Neff replied: "The parties represented by W. Dale Clark, including the defendant World Publishing Company, now known as Herald Liquidating Company, a Nebraska corporation, and the stockholders of World Publishing Company, a Nebraska corporation".

In his deposition, Neff testified that he had no contact with Kiewit or Kiewit Companies in connection with the transaction, never had any personal contact with Kiewit or anybody connected with him, and that, except for the efforts he had made in behalf of Newhouse, he had no part in the sale of the assets to the Kiewit interests.

 Neff's claim against Kiewit and Kiewit Companies, based on alleged liability in contract or quasi-contract, finds no support in the record.

 Neff asserts that the denial by Clark and World of his contention that, at the meeting of October 8 and 9 the "minds of the parties met", that the terms of a valid contract were "finalized" and agreed upon, and that the writings designated Exhibits A to E, inclusive (hereinbefore described), constitute a binding and enforceable contract, raises a genuine issue of material fact. This

court has previously held that the interpretation of such writings, and the determination of whether or not they constitute a valid contract, is not a factual issue, but a legal issue, and that it is the duty of the court to make such determination in proper proceedings. See: Canton Cotton Mills, supra.

In pressing his claim that a valid contract was executed, Neff argues that "it must be borne in mind that Neff's affidavit recites, that between October 10th and 19th, 1962 not only did the Board of Directors unanimously, but 70% of the stockholders in addition, approved the Newhouse contract, with knowledge of its terms". Neff contends that the Board of Directors "ratified" the "contract" and that they, together with 70% of the stockholders, "approved the Newhouse contract", and as a result of their conduct are estopped to deny the existence of the "contract". The record cited by Neff in support of this position is a copy of the resolution of the Board adopted at its meeting on October 19. Neff was not present at that meeting and makes no claim of record to personal knowledge. In fact he states he never returned to Omaha after October 1. The record reveals the resolution to be, in part, as follows:

> "BE IT RESOLVED, that in the event the stockholders of World Publishing Company, at a special meeting of the stockholders, to be held on October 31, 1962, approve the plan of complete liquidation of this corporation as adopted by the Board of Directors at their meeting on October 19, 1962, and subject to the ratification of this Resolution by the stockholders, the Chairman of the Board of this corporation shall be, and hereby is, authorized and directed to accept the proposal of Samuel I. Newhouse * * *".

By its own clear terms, the resolution was subject to ratification by the stockholders. Such action was never taken. The fact is that the Board held another special meeting on October 30, at which time the Kiewit offer was presented, and

the Board unanimously resolved that if the stockholders, at their meeting called for the following day, approved the plan of liquidation previously adopted by the Board, that both the Newhouse and Kiewit proposals should be submitted for action of the stockholders. At the October 31 meeting of stockholders the plan of liquidation was adopted, Newhouse's offer was rejected, and Kiewit's offer was unanimously accepted.

The recitation in Neff's affidavit heretofore referred to, concerning the alleged approval of the Newhouse contract by 70% of the stockholders, does not purport to be based on personal knowledge. The statements involved are prefaced by such words as "I have also ascertained that * * *", "I have found through my attorney's examination of documents in the possession of Barton H. Kuhns that * * *", "I have also ascertained through such investigation that * *", and "it satisfactorily appears that * * *". Such assertions by Neff, totally unsupported by the record and based upon matters beyond his personal knowledge, constituting his conclusions or based upon his interpretation of written documents, and having no probative value, are patently legally frivolous and insufficient to create a genuine issue of material fact within the purview of Rule 56.

Rule 56(e), F.R.C.P., provides, inter alia, that "Supporting and opposing affidavits shall be made on *personal knowledge,* shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein". (Emphasis added.) Therefore, in determining whether summary judgment is proper, statements contained in affidavits, which would be inadmissible in evidence (such as statements of opinion, belief and hearsay) must be disregarded. See: Barron & Holtzoff, Federal Practice and Procedure, Vol. 3, Section 1237; United States of America for use of Kolton et al. v. Halpern et al., 3 Cir., 260 F.2d 590; Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct.

894, 94 L.Ed. 1312; McClellan et al. v. Montana-Dakota Utilities Co., 8 Cir., 204 F.2d 166, cert. denied, 346 U.S. 825, 74 S.Ct. 43, 98 L.Ed. 350; and Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318, 322. In that portion of the opinion of this court in Minnesota Mining and Manufacturing Co. v. Superior Insulating Tape Company, 8 Cir., 284 F.2d 478, 483, which discussed the required form and contents of affidavits submitted in a summary judgment proceeding, we said:

> "If the movant has made a convincing showing that no genuine controversy on decisive facts exists, 'mere denials unaccompanied by facts which would be admissible in evidence at a hearing are not sufficient to raise a genuine issue of fact'."

It is clear, therefore, that the relevant portions of Neff's affidavit in opposition to the motions for summary judgment do not comply with Rule 56(e), and are incompetent to raise a genuine issue of fact. However, the contents of Neff's deposition, set out in the supplemental record, have received our careful examination and consideration.

We hold, therefore, that Neff's contention that the documents hereinbefore referred to (Exhibits A through E) constitute a "valid and binding contract of sale * * * without condition" is only an expression of his opinion or conclusion, factually unsupported, is utterly devoid of merit, and that, as to this, no genuine issue exists.

One of Neff's assignments of error is that the trial court erred in failing to find that there existed a genuine issue of fact concerning the alleged personal liability of defendant Clark. Insofar as the contract aspect of the case against Clark is concerned, it is based upon Neff's contention that Clark promised Newhouse to use his best efforts to get the latter's proposal accepted, and failed to comply with such promise. Clark concedes that he made such a promise, but contends that he did comply therewith and did everything he could, consistent with his fiduciary relationship with the corporation and its stockholders, to secure such result.[3] Neff argues that this dispute clearly creates a genuine issue of material fact.

This promise of future action was made by Clark to Newhouse, or to Goldman, as counsel for Newhouse, during the preliminary negotiations leading up to the drafting of the proposals eventually submitted by Newhouse. It was doubtless made (as were some of the other statements allegedly made at that time by Clark) to induce formal action on the part of Newhouse—action which was taken, and which culminated in the formal written proposals. Neff does not contend that any such promise was made to him, or that his position was changed, to his detriment, by Clark's making such promise. The giving of said promise to Newhouse created no rights in Neff, the breach of which could be the basis of a cause of action against Clark. Furthermore, all the parties involved in the negotiations knew of the relationship existing between Clark and World, and dealt with him, not individually, but in his representative capacity. As early as the September 25 meeting, Neff knew that World was a corporation, and he was thereafter present during discussions concerning the requirements of Nebraska statutes with reference to corporate action involving the sale of its assets. Newhouse's offer was directed to the corporation, and one of the specific conditions was acceptance by the corporation. In his affidavit Neff states that he first telephoned Clark because he had been informed that he, Clark, "was the Chairman of the Board of the World Publishing Company and the man in authority who had the power to represent

---

3. As Chairman of the Board and a director of World, Clark occupied a fiduciary relationship to it. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Stillinger & Napier v. Central States Grain Company, 164 Neb. 458, 82 N.W.2d 637, 643.

the paper and negotiate on behalf of the corporation and its stockholders".

■ We find no facts in the record which would support liability on the part of Clark, individually, based upon contract, express or implied. See: 3 C.J.S. Agency § 215, page 119.

One of the grounds of liability asserted by Neff against Clark, individually, is that of fraud. In his brief, Neff fails to pursue specifically his allegation of actionable fraud on the part of Clark. Apparently, the basis for his charge of fraud is that on October 8, when Goldman indicated he did not wish to prepare an offer to be submitted by Newhouse which might be used to secure competitive bids from others, Clark allegedly made certain false statements or misrepresentations. Neff claims that, at that time, Clark stated to Goldman that he "need have no fear of that" (with reference to Goldman's expressed reluctance to have Newhouse sign an offer which might instigate competitive bidding) and that he then had proxies from 67 to 70% of the stockholders. Clark denies making such statement; he does admit that he promised Goldman he would use his best efforts to secure approval of an offer, if made.

■ The applicable rule was well stated by this court speaking through the late Judge Gardner, in Boatmen's National Company v. M. W. Elkins & Co., Inc. et al., 8 Cir., 63 F.2d 214, 216, in the following laguage:

> "To sustain an action for damages for fraud and deceit, the representation made (1) must have been as to material facts; (2) it must have been knowingly false; (3) it must have been made with the intention that it should be acted upon by the person to whom made; (4) that person must have been ignorant of its falsity; (5) he must have relied on its truth; and (6) the false representation must have been the proximate cause of the injury or damage."

Citation of authorities followed. This quotation was referred to by us, with approval, in Roosevelt et al. v. Missouri State Life Insurance Co. et al., 8 Cir., 78 F.2d 752, 757. Also see: 37 C.J.S. Fraud § 3, page 215 et seq., and Sec. 36, page 284; and Cook Livestock Co., Inc. v. Reisig, 161 Neb. 640, 74 N.W.2d 370. As we have already pointed out, any promises or statements made by Clark, if made at all, were directed to Goldman, as Newhouse's representative, and not to Neff, and were made in connection with preliminary negotiations as to whether action would be taken by Goldman which would culminate in a written offer to be submitted by Newhouse. Neff does not contend that such statements were made by Clark to him, or with the intention that he, Neff, should act or rely upon them, or that he changed his position in any way as a result thereof, and there is absolutely nothing in the record which supports any claim by Neff that he suffered any damage, which damage "flowed from the fraud as the proximate, and not the remote, cause". Boatmen's, supra. The fact is that Neff testified there was no change in his arrangements with Newhouse, as to compensation, after October 8. It is clear that Neff's contention as to this assignment of error is totally without merit, and no genuine issue exists as to it.

## TORT

Turning now to the tort aspect of this case, we find that Neff contends the trial court erred in failing to find that a genuine issue of a material fact existed with regard to Neff's alleged right to "recover against the defendants for malicious interference with plaintiff's contractual relationship" and as to his "right to recover against the defendants for conspiracy".

While these assertions refer to "the defendants", the charge of malicious interference is directed primarily to Kiewit and Kiewit Companies, and that of conspiracy is directed primarily to Kiewit and Clark. The "contractual relationship" referred to apparently arises out of

that alleged contract between Newhouse and World, of which Neff claims to have been a third-party beneficiary. In this argument, too, Neff stands firmly upon the proposition that Exhibits A through E constituted a completed, binding contract between Newhouse and World; that he has certain contractual rights thereunder, as a third-party beneficiary; and that, as such beneficiary, he has a right to sue "the defendants" for unlawful interference with the performance thereof and for inducing or causing the breach thereof by defendant World.

 The question of whether or not Neff was such a beneficiary of the alleged contract as would have entitled him to sue thereunder, or an incidental beneficiary only, has been exhaustively briefed and argued by the respective parties. However, in view of our determination, adverse to Neff's contention, that Exhibits A through E constituted an offer only, and that the same never ripened into a contract, this question requires no consideration by us. It necessarily follows, as a matter of law, that there could have been no interference with any alleged contractual rights of Neff thereunder.

> "Recovery may be had for inducing breach of contract by establishing (1) *the existence of a contract;* (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." (Emphasis added.) Royal Realty Company v. Levin et al., 244 Minn. 288, 69 N.W.2d 667, 671.

In 30 Am.Jur., Interference, Sec. 22, page 73, it is stated: "The existence of a contract is, of course, a primary element of liability for procuring a breach of contract." Also see: Franhan Dis-

tributors v. New York World's Fair 1939, Inc. et al., 2 Cir., 124 F.2d 82, cert. denied 316 U.S. 687, 62 S.Ct. 1277, 86 L.Ed. 1759; Southwestern States Oil and Gas Company v. Sovereign Resources, Inc., (Tex.Civ.App.) 365 S.W.2d 417; and Zoby v. American Fidelity Company et al., 4 Cir., 242 F.2d 76.

 Neff has also argued that he has a cause of action against Clark and Kiewit for the breach of an oral contract allegedly made between Clark and Newhouse—the theory of his claim against Kiewit, as to this oral contract, being that Kiewit wrongfully interfered with the performance thereof by Clark. We have already considered and disposed of Neff's contention that he has a cause of action against Clark, personally, for the latter's alleged violation of his promise to Newhouse to use his best efforts to have Newhouse's proposal accepted by World (which is the "oral contract" referred to by Neff in this regard). We decided that even if this promise was violated (which is denied by Clark), such violation would have created no liability in favor of Neff, as the making of such promise created no contractual rights in his favor. We have found nothing in the record that would support the claimed liability of any of the defendants for alleged unlawful interference with contractual rights of Neff.[4]

 Notwithstanding what we have already said, we deem it advisable to discuss Neff's contention that a genuine issue of material fact exists as to his "right to recover against the defendants for conspiracy". In his brief, Neff apparently limits this claim to two of the defendants, for he therein asserts that "there is a genuine issue of fact * * as to whether Kiewit and Clark conspired to injure the plaintiff".

---

4. In view of Neff's unqualified contention that his contractual rights are based upon a binding contract, it becomes unnecessary for us to discuss the law relating to the circumstances under which an alleged "wrongful interference" preventing the formation of a valid contract (if it would have been consummated but for the wrongful interference) might give rise to a cause of action, or the circumstances under which the law protects against "unjustified interference" with the right to enter into a contract, or against "unjustified interference" with a prospective or potential contract that has not yet come into existence.

" \* \* \* a 'civil conspiracy' (is) a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object; or a lawful object by unlawful or oppressive means." National Fireproofing Co. v. Mason Builders' Ass'n et al., 2 Cir., 169 F. 259, 26 L.R.A.,N.S., 148.

"The principal element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury." Reid v. Brechet et al., 117 Neb. 411, 220 N.W. 590, 591, rehearing denied 221 N.W. 17, quoted with approval in Rettinger v. Pierpont, 145 Neb. 161, 15 N.W.2d 393, 411; and Stillinger & Napier, supra. "To constitute a conspiracy there must be a combination of two or more persons; \* \* \* a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy." 15 C.J.S. Conspiracy § 2, page 997.

In order to create civil liability based upon a charge of conspiracy, there must have been an act done pursuant to the scheme and in furtherance of the object, by one or more of the conspirators. 15 C.J.S. Conspiracy § 5, page 1000. In Nalle v. Oyster, 230 U.S. 165, 182, 33 S.Ct. 1043, 1048, 57 L.Ed. 1439, the Supreme Court of the United States said: "But the well-settled rule is that no civil action lies for a conspiracy unless there be an overt act that results in damage to the plaintiff." The Supreme Court of Iowa, in Nelson v. Melvin et al., 236 Iowa 604, 19 N.W.2d 685, 687, expressed the rule as follows: "In determining whether a civil cause of action has been alleged, the charge of conspiracy alone does not state a cause of action. In Olmsted, Inc., v. Maryland Cas. Co., 218 Iowa 997, 998, 253 N.W. 804, this court stated: 'This court is committed to the rule that a conspiracy cannot be the subject of a civil action unless something is done pursuant to it which, without the conspiracy, would give a right of action.'" And in Lewis Invisible Stitch Machine Co. v. Columbia Blindstitch Machine Mfg. Corporation, 2 Cir., 80 F.2d 862, 864, Judge Learned Hand stated that "Whatever may be the rule in criminal conspiracies, it is well settled that the civil liability does not depend upon the confederation (which need be alleged only by way of inducement), but upon the acts committed in realization of the common purpose." The author of the article on conspiracy in Corpus Juris Secundum stated the rule to be: " \* \* unless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone." 15 C.J.S. Conspiracy § 6, page 1000.

The object of the alleged conspiracy, according to the pleadings and arguments of Neff, was interference with the performance of, and inducement of the breach of, the alleged contract between Newhouse and World. It is clear, therefore, that the acts allegedly done by one or more of the defendants in furtherance of the conspiracy, and pursuant thereto, were the very same acts which allegedly interfered with the alleged contractual relationship existing between Newhouse and World, and of which Neff contends he was a beneficiary. We have already held that there was no such contract, the existence of which is a necessary and primary element of liability for such alleged interference. Since such acts, if accomplished, would have created no right of action, it necessarily follows that whether or not there was a conspiracy to perform the same, as alleged by Neff, is immaterial. Therefore, even assuming, arguendo, that the record does disclose a factual issue as to the existence of a conspiracy, it does not follow that this constitutes a genuine issue within the purview of Rule 56(e). Durasteel Co. v. Great Lakes Steel Corporation, 8 Cir., 205 F.2d 438.

Other points have been raised and briefed by the parties hereto. However,

in view of the dispositive effect of the foregoing, we deem it unnecessary to extend this already lengthy opinion by discussing them.

The judgment of the district court, sustaining defendants' motions for summary judgment, is

Affirmed.

