**FAIRWAY CENTER CORPORATION,**
Appellant,

v.

**U. I. P. CORPORATION, Appellee.**

No. 73–1773.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1974.

Decided Sept. 10, 1974.

Lay, Circuit Judge, concurred in result and filed opinion.

See also, 8 Cir., 491 F.2d 1092.

Edward W. Dailey, Burlington, Iowa, for appellant.

J. C. Riley, Burlington, Iowa, for appellee.

Before LAY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

This is an action by Fairway Center Corporation (Fairway), originally brought in Iowa state court, seeking specific performance of an alleged contract for the sale by it of the Fairway Center shopping center in Burlington, Iowa, to the U.I.P. Corporation (UIP). This action was removed by UIP to the federal district court under 28 U.S.C. § 1441. Jurisdiction is based on diversity of citizenship.

After a trial to the court the district judge, the Honorable William C. Stuart, found that there was no contract between the parties because there had been no "meeting of the minds." He, therefore, refused to order the requested spe-

cific performance and dismissed the action. Fairway appeals, and we affirm the district court's decision.

In 1969 UIP formed Oceanada Corporation (Oceanada) and transferred some real estate holdings to that corporation in return for stock. Oceanada had been set up primarily for the purpose of developing real estate, but by late 1969 UIP wanted to divest itself of its Oceanada stock because of difficulties it was having in obtaining good management for Oceanada.

In the meantime the board of directors of Fairway had decided to sell its shopping center and made contact with two of the principal officers of Oceanada about a possible sale. Shortly thereafter these two officers were killed in an airplane accident. UIP then approached Fairway with an offer to exchange part of its Oceanada stock for the shopping center. While Fairway was not interested in obtaining Oceanada stock as such, the parties did enter into negotiations to see if a mutually satisfactory arrangement could be made. Initially these negotiations were carried on by counsel for the two corporations, and in early 1970 the Chicago firm of Arvey, Hodes and Mantynband, attorneys for Fairway, drafted an agreement which was submitted to UIP's attorneys, the Milwaukee firm of Frisch, Dudek, Slattery and Denny. The Frisch firm made several changes in this draft, and a second proposed agreement was prepared by Fairway's counsel. On March 10, 1970, the board of directors of UIP passed a resolution approving the purchase and authorizing certain officers to execute and deliver any agreement substantially in the form of this second proposal.

Pursuant to this resolution, Mr. John Frisch, Secretary of UIP and a member of the law firm representing that corporation, and Mr. James L. Dorman, an executive vice-president of UIP, went to the Arvey firm's office in Chicago the next day, March 11, 1970. Their purpose was to make necessary changes in the second draft and to come up with a

final draft for signature. After several hours of negotiation with members of the Arvey firm and Mr. Irving Berlin, President of Fairway, they were successful, and the final proposed agreement was signed by Dorman for UIP and Berlin for Fairway that day. The agreement provided that neither party would be obligated to perform unless the execution and delivery of the agreement had been authorized or ratified by the boards of directors of Fairway and UIP and by the shareholders of Fairway.[1]

The key provision of the agreement was paragraph 15(a), which dealt with the manner in which UIP was to pay for the shopping center. This paragraph represented an attempt to reconcile Fairway's goal of selling the shopping center and obtaining the most cash possible with UIP's goal of acquiring the shopping center in exchange for Oceanada shares without committing itself to any cash outlay.[2] This paragraph provided that UIP would use its "best efforts" to cause the Oceanada stock it was

1. Paragraph 11(e) of the agreement provided:

(e) on or prior to the Closing Date the execution and delivery of this Agreement and the consummation of all of the transactions provided for herein shall have been duly authorized or ratified by the respective Boards of Directors of Fairway and UIP, and by the holders of the requisite number of shares of Fairway;

Paragraph 12(g) provided:

(g) on or prior to the Closing Date the execution and delivery of this Agreement and the consummation of all of the transactions provided for herein shall have been duly authorized or ratified by the respective Boards of Directors of Fairway and UIP and by the holders of the requisite number of shares of Fairway;

2. Paragraph 15(a) read as follows:

15.(a) UIP covenants and agrees to use its best efforts to cause the shares of Common Stock of Oceanada delivered to Fairway pursuant to this Agreement (hereinafter referred to as the "Fairway Oceanada Shares") to be fully registered (as hereinafter defined), within eighteen months after the Closing Date. UIP further covenants and agrees to use its best efforts so that on the date such registration becomes effective, all of the Fairway Oceanada Shares shall be includable in a firm Underwriting Agreement with a reputable Underwriter or to arrange for another lawful public or private market for all of the Fairway Oceanada Shares and designate such market in writing to Fairway within eighteen months after the Closing Date. In the event such underwriting of Fairway Oceanada Shares or such sale of Fairway Oceanada Shares in any other then available lawful public or private market designated in writing by UIP to Fairway would result in a net cash price (free of all commissions) to the sellers of the Fairway Oceanada Shares of at least $3.00 per share, UIP

shall have no further obligation under this paragraph 15 hereof.

In the event such underwriting or other then available lawful public or private market designated in writing by UIP to Fairway would result in a net cash price (free of all commissions) to the sellers of the Fairway Oceanada Shares of less than $3.00 per share (the amount by which said net cash price is less than $3.00 per share is hereinafter referred to as the "Underwriting Price Deficiency"), then before such Registration Statement becomes effective, and before any sale of Fairway Oceanada Shares is made in any other then available lawful public or private market designated by UIP, as the case may be, UIP shall, at its election, either (i) pay in cash to Fairway an aggregate amount of money equal to the sum of the Underwriting Price Deficiency multiplied by the total number of Fairway Oceanada Shares; or (ii) deliver to Fairway that number of validly issued, full paid, non-assessable and fully registered shares of Common Stock of Oceanada, includable under said underwriting agreement or otherwise then freely and lawfully marketable shares of Common Stock of Oceanada, which, when added to the total number of Fairway Oceanada Shares and then multiplied by the net cash price (free of commissions) to the sellers of the Fairway Oceanada Shares under said underwriting agreement or in a sale in any other lawful public or private market designated by UIP as above set forth, shall equal the Minimum Value (as hereinafter defined); or (iii) issue to Fairway validly issued, full paid and non-assessable shares of Common Stock of UIP, which shares are then, or within twenty-four (24) months after the Closing Date will be, fully registered and validly listed for trading on the American Stock Exchange and any other stock exchange on which shares of Common Stock of UIP are then listed for trading, and which shares on the date of

transferring to Fairway to be registered under the Federal Securities Act of 1933 within eighteen months after closing. UIP also agreed to use its "best efforts" to arrange for all of the so-called "Fairway Oceanada" shares to be included in a firm underwriting agreement or to arrange for another lawful public or private market for these shares within eighteen months of closing. If the underwriting or other sale of the Fairway Oceananda shares resulted in a net price per share of less than $3.00, then UIP had three options to make up the difference, so that Fairway shareholders would receive the full agreed price for the shopping center. (1) UIP could simply pay the difference in cash. (2) UIP could deliver enough additional registered Oceanada shares to Fairway so that the total market value of all the Oceanada shares was equal to the total purchase price of the shopping center. (3) UIP could deliver enough fully registered common shares of UIP, so that at their aggregate fair market value they made up the difference between the selling price of the Fairway Oceanada shares and the agreed purchase price of the shopping center.

Paragraph 15 was silent as to what would happen if UIP's "best efforts" failed and the Fairway Oceanada shares were not registered or no underwriting agreement or other public or private sale were arranged.

On March 17, 1970, the March 11 agreement was presented to the Fairway board of directors for the required ratification. However, rather than ratifying the agreement as written, the board ratified it subject to certain amendments being added to it, the most important of which was an effort to set forth what would happen if UIP was unable to register the Oceanada stock or arrange a public or private sale therefor. The key

paragraph of this "Amendment Agreement" is as follows:

Paragraph 15(a) of said Agreement is amended to add at the end thereof the following:

"In the event UIP shall not, within eighteen (18) months after the Closing Date, cause the Fairway Oceanada Shares to be fully registered and be includable in a firm Underwriting Agreement or arrange for another lawful public or private market for all of the Fairway Oceanada Shares and designate such market in writing to Fairway, then UIP shall within twenty-four (24) months after the Closing Date either (i) pay in cash to Fairway the sum of the Minimum Value (as hereinafter defined); or (ii) issue to Fairway validly issued, full paid and non-assessable shares of Common Stock of UIP, which shares are fully registered and validly listed for trading on the American Stock Exchange and any other stock exchange on which shares of Common Stock of UIP are then listed for trading, and which shares at the date of issue have an aggregate fair market value (as hereinafter defined) of at least the Minimum Value (as hereinafter defined)."

Careful analysis of this proposal reveals that in addition to clarifying paragraph 15, it also changes it. In essence, the amendment provides that if UIP's "best efforts" to cause the Fairway Oceanada shares to be registered and to arrange for an underwriting agreement or other sale fail, then those shares will be deemed worthless; and UIP will have to pay the entire price of the shopping center in cash or UIP common stock. The proposed amendment is silent as to what would become of the Fairway Oceanada shares in the event no registration or sale was arranged by UIP, even though those shares could, in fact, still retain some value.

issue have an aggregate fair market value (as hereinafter defined) of at least the sum of the Underwriting Price Deficiency

multiplied by the total number of Fairway Oceanada Shares.

On March 18, 1970, Mr. E. A. Wahlen of the Arvey firm prepared a proposed amendment agreement incorporating the changes desired by the Fairway board. He sent this proposal to Mr. Frisch that day along with a letter which described the amendment as a "Clarification of the obligations of U.I.P. Corporation."

The UIP board met on March 23, 1970, but the proposed amendments were not submitted to it at that time. The board did, however, approve the March 11 agreement and authorized its officers to perform all acts necessary to consummate the agreement "consistent with the proposed agreement" of March 11.

On March 24, 1970, Mr. Dorman was visited by Mr. Berlin, Fairway's president, who indicated to Dorman that he needed to obtain Dorman's signature on the amendment agreement so that he could present it at a shareholders meeting scheduled for March 30, 1970. Both Dorman and Berlin professed to not fully understand the amendment, but Berlin indicated that it did not change the basic agreement at all. Dorman told Berlin that he could not sign without first checking with Frisch. This he did, and Frisch indicated that if Dorman did sign in order to accommodate Berlin, he should do so only with an accompanying letter setting out UIP's understanding of the agreement as amended. On March 27, 1970, Dorman returned the amendment he had signed along with an explanatory letter also dated March 27, 1970. This letter stated:

I have also executed on behalf of U.I.P. Corporation the proposed amendment agreement furnished which clarifies the original agreement, however as further clarification we would like to point out that it is our mutual understanding that U.I.P. shares or cash referred to is not in lieu of the Oceanada shares but only in an amount which may be required to supplement the aggregate fair market value of the Oceanada shares.

On March 30, 1970, the special shareholders meeting of Fairway Center Corporation was held in Chicago. The minutes of that meeting reflect that the shareholders voted to authorize the sale of the shopping center to UIP "for the consideration and upon the terms and conditions set forth in the agreement with U.I.P. Corporation dated March 11, 1970, *as amended by agreement dated March 30, 1970, which agreement as amended is hereby adopted and approved . . . .."* (Emphasis supplied.)

On April 1, 1970, Mr. Wahlen of the Arvey firm responded by letter to Dorman's explanatory letter of March 27. In pertinent part this letter said:

Paragraph 2 of your letter of March 27 is not correct. It is the understanding of Fairway Center Corporation and all of its shareholders that in the event the Fairway-Oceanada Shares are not fully registered and underwritten or U.I.P. has not arranged for a lawful public or private sale of those shares, then, on or before 24 months after the Closing Date U.I.P. will deliver to Fairway Center Corporation U.I.P.'s shares or cash in an amount equal to the Minimum Value as defined in the Agreement, inasmuch as it will be considered for all purposes that the Fairway-Oceanada Shares have no value whatsoever if they are not fully registered and underwritten, or a lawful public or private sale of the Fairway-Oceanada Shares has not been arranged by U.I.P. Neither Fairway Center Corration nor its shareholders can get into any discussion at the 24 month date that Fairway-Oceanada Shares have any market value whatsoever in the absence of being fully registered and underwritten, or the subject of a lawful public or private sale thereof arranged for by U.I.P.

Dorman replied to Wahlen's letter on April 4, 1970, as follows:

This is in response to your letter dated April 1, 1970. There appears to be a serious misunderstanding which must be satisfied prior to the formal

closing of the contemplated U.I.P. and Fairway Center Corporation transaction.

According to paragraph 15(a) U.I.P. agreed to use its best efforts to cause the Oceanada shares to be registered and included in an underwriting agreement eighteen months after the closing date. Also according to the agreement, U.I.P. is to use its best efforts for a private sale of such shares.

In our discussions it was understood that disposition of the Oceanada shares in accordance with the above was to be orderly so as not to depress the market because of the number of shares involved.

It is our understanding from the agreement that in the event the disposition of the Oceanada shares in this manner yields less than $3.00 per share then U.I.P. will make-up the difference in U.I.P. common stock or cash within twenty-four months of the closing date.

Wahlen did not respond to this letter, and he testified at the trial that he felt the last three paragraphs reflected his understanding of the agreement as amended and required no answer.

Some further negotiation continued after this, but on May 15, 1970, counsel for UIP notified Fairway's counsel that UIP was "terminating all further negotiations and transactions for the acquisition of the Fairway property . . .." In the meantime UIP had concluded another agreement with another company by which it had acquired land in return for shares of Oceanada.

On May 21, 1970, Fairway replied that it regarded the May 15 letter as an anticipatory breach of the agreement. This action was filed in December of that year.

A summary of the situation as it stood after the final correspondence from Dorman to Wahlen is this: The UIP board of directors had approved the March 11 agreement as originally written. The Fairway board of directors and shareholders had approved the March 11 agreement as amended. In short, they had not ratified the same thing.

Mr. Dorman of UIP had signed the amendment, but his explanatory letter of March 27 and his letter of April 4 make it clear that he did so without agreeing that the UIP promise to use its "best efforts" to cause the Fairway Oceanada stock to be registered and to arrange a sale should be turned into a guaranty or that the Fairway Oceanada stock would be deemed to have no value. Mr. Wahlen, on behalf of Fairway, on the other hand, had made it explicitly clear in his letter of April 1 that Fairway understood the amendment to mean that if no registration and sale were arranged by UIP, then UIP would have to pay the *entire* purchase price in cash or UIP common shares.

It is in this factual context that we must determine whether or not the trial court was correct in holding that no contract between the parties had come into existence.

## I.

The trial court found that there was no binding contract for the sale of the shopping center because there had been no "meeting of the minds" of the parties. This Court has cautioned that the use of the term "meeting of the minds" should not lead to a requirement that the subjective "mental processes of each party must concur before a contract can result. . . . On the contrary, it is what is expressed by the parties that constitutes the contract which courts enforce." Industrial Products Mfg. Co. v. Jewett Lumber Co., 185 F.2d 866, 869 (8th Cir. 1950). Iowa, too, has adopted the objective test to determine the intent of the parties. Rotterman v. General Mills, 245 Iowa 229, 61 N.W.2d 718, 722–723 (1953).

Nonetheless, it remains clear that mutual assent is an essential prerequisite for the formation of a contract.

Professor Corbin states the rule in the following manner:

> The great majority of contracts are bargaining contracts, the purpose of which is to effect an exchange of promises or of other performances. To attain this purpose, there must be mutual expressions of assent to the exchange. These expressions must be in agreement . . ..

1 A. Corbin, Corbin on Contracts § 107, at 478 (1963). *See also,* 1 S. Williston, Law of Contracts § 22 (3d ed. 1957); Restatement of Contracts § 20 (1932).

In language which is pertinent to this case our Court has expressed the mutual assent requirement in Neff v. World Publishing Co., 349 F.2d 235, 248 (8th Cir. 1965).

> One of the essential elements of a contract is "mutuality of agreement" or "mutual assent"—frequently referred to as a "meeting of the minds" of the parties. In Joseph v. Donover Company et al., 9 Cir., 261 F.2d 812, at page 820, the Court said:
>
> "To create a contract, then, the minds of the parties must meet as to every essential term of the proposed contract, and there must be a clear and unequivocal acceptance of a certain and definite offer in order that a mere agreement may become a contract. Therefore, it is necessary, among other things, that the minds of the parties meet as to the essential terms of the proposed contract."

■ The Iowa Supreme Court has said quite simply: "Of course, to become contractually bound, either orally or by writing, the parties must manifest a mutual, unequivocal assent to the terms of the contract." McCarter v. Uban, 166 N.W.2d 910, 913 (Iowa 1969). *See also,* Hayne v. Cook, 252 Iowa 1012, 109 N. W.2d 188, 192 (1961); Krutsinger v. School Tp. of Liberty in Lucas Cty., 219 Iowa 291, 257 N.W. 797, 798 (1934).

The court went on in *McCarter, supra,* to explain what may be considered when deciding whether or not there was mutual assent to a contract.

> The existence of an agreement or meeting of the minds should not alone be determined from the words used by the parties, but also from the situation and surrounding circumstances and by the inferences which mankind would ordinarily and reasonably draw therefrom.

McCarter v. Uban, *supra,* 166 N.W.2d at 913. See also Alpen v. Chapman, 179 N.W.2d 585, 589 (Iowa 1970), in which the Iowa court said: "[W]hether preliminary negotiations remained at that, or actually ripened into an oral contract, depends upon the intention of the parties as gleaned from the facts of the case."

■ In summary, then, the general rule, which is followed in Iowa, is that no contract can come into existence absent a manifestation of mutual assent thereto by the parties. Whether or not there has been such mutual assent depends upon the intention of the parties as determined objectively from their words and actions viewed within the context of the situation and surrounding circumstances.

Applying the foregoing principles of contract law to the facts of this case, it is evident that UIP and Fairway never formed a binding contract, because they never mutually assented to the same agreement.

■ When Mr. Berlin and Mr. Dorman signed the proposed agreement on March 11, 1970, they did not intend their signatures to be a binding assent to its terms; for that writing itself contained express provisions that it would only be operative if approved or ratified by the two corporations. It is equally clear that the board of directors of UIP and the board and shareholders of Fairway never approved or ratified the same agreement. UIP approved it as written. *Fairway approved it as amended.*

Finally, even assuming Dorman had the authority to bind UIP to the terms of the amendment (an assumption we will discuss later in this opinion), his signature thereon did not manifest a

"mutual, *unequivocal* assent" to those terms as interpreted by Fairway. Dorman's intent may be objectively ascertained from the contents of his March 27 explanatory letter. He clearly did not intend to assent to any contract which would result in UIP paying the *entire* purchase price of the shopping center in cash or UIP common stock. Mr. Wahlen's April 1 reply letter to Dorman indicates that even at that time Fairway realized that Dorman had not given unequivocal assent to the same interpretation of the amendment as it had. UIP simply did not agree with Fairway that in the event UIP could not register or sell the Fairway Center Oceanada shares that these shares would be deemed to be without value in determining the amount of cash or UIP shares to be transferred from UIP to Fairway pursuant to the terms of paragraph 15(a).

This is not a case in which both parties signed and ratified the same agreement with each party thinking that the agreement meant something different. Here, it is clear that there was never any mutual assent by the parties to the same contract terms regarding UIP's manner of payment for the shopping center. Without that requisite assent there was no binding contract, and the trial court properly refused to grant specific performance.

## II.

The trial court also found, and we agree, that Mr. Dorman did not have authority from the UIP board of directors to execute an agreement in accordance with Fairway's interpretation of the amendment. Therefore, even if there were mutual assent between Dorman and Fairway as to the amendment, Dorman's assent would not be binding on UIP.

■ Under Iowa law "the scope of authority of an agent is to be determined by the trier of fact." Stauter v. Walnut Grove Products, 188 N.W.2d 305, 311 (Iowa 1971). As a finding of fact the district court's determination must be sustained by us unless clearly erroneous. Fed.R.Civ.P. 52(a). A review of the evidence satisfies us that the trial court's finding is not clearly erroneous.

At the March 23, 1970, meeting of the UIP board of directors, the following resolution was passed:

RESOLVED, that the Executive Committee and the proper officers are authorized to perform such acts in connection with the contingencies and requirements leading to the acquisition of Fairway Shopping Center as are consistent with the proposed agreement as signed by the principals on March 11, 1970.

It is upon this resolution that Fairway bases its contention that Dorman did have authority to bind UIP to the agreement as amended.

■ However, as already discussed, the proposed amendment to paragraph 15 of the March 11 agreement was not "consistent with" that paragraph as written. It not only filled the gap in original paragraph 15, but in effect it also changed UIP's promise to use its "best efforts" to cause the Fairway Oceanada shares to be registered and to arrange a sale, into a commitment to pay Fairway a minimum price in cash or listed shares of UIP if such best efforts failed. Dorman had no authority from the board to agree to this inconsistent amendment. Dorman himself testified at the trial that he did not believe he had been given the authority to bind UIP to the amendment as it was subsequently interpreted by Fairway, and Mr. John F. Catalane, who was President of UIP at the relevant times, in a deposition introduced into evidence at the trial, testified that Dorman acted without authority in signing the amendment. Certainly, in light of this, it cannot be said that the trial court was clearly erroneous in its finding of fact and therefore the "Amendment Agreement" was properly held by the trial court to have been not authorized by UIP's board as required by the original agreement.

## III.

Fairway additionally urges that we should reverse based on the allegation

that the trial court erred in not granting its motion for a continuance. The background of this argument is that at the conclusion of defendant UIP's case on July 19, 1973, Fairway made an oral motion which was, in essence, a motion for a continuance in order to allow it time to take certain depositions to be used in rebuttal. UIP resisted this motion, and the trial judge refused to grant the continuance.

 It is well settled that a motion for a continuance is directed to the sound discretion of the trial court and that the court's determination will not be reversed on appeal unless an abuse of that discretion is shown. Grunewald v. Missouri Pacific R.R., 331 F.2d 983, 986 (8th Cir. 1964); Lessmann v. Commissioner of Internal Revenue, 327 F.2d 990, 996 (8th Cir. 1964); Janousek v. French, 287 F.2d 616, 623 (8th Cir. 1961); 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2352 (1971). We are convinced that Fairway has not met its burden of establishing an abuse of discretion in this case.

The depositions which Fairway's counsel proposed to take during the continuance were to be directed at the issue of mutual assent to the terms of the agreement as amended. He sought to depose John F. Catalane, the President of UIP during March, 1970, who had already been deposed by Fairway. He also proposed to depose Bart C. Catalane, who had been on the UIP board of directors at the relevant times. The offer of proof filed by Fairway on August 6, 1973, indicated that each would testify to the effect that their understanding of the agreement as amended was the same as Fairway's and that they had assented to those terms.

There is serious question that the proffered testimony would lead to a different result. No matter what the Catalanes might have thought about the negotiations of March, 1970, there would still be insufficient objective evidence of a manifestation of mutual assent by the UIP board of directors as a whole.

However, leaving this analysis completely aside, there is ample reason to find no abuse of discretion in the fact that Fairway offers no valid excuse for not having taken the desired depositions prior to the last day of the trial. The proceedings below occurred in three segments, the trial being held on May 17 and 18, 1973; May 21, 1973; and July 19, 1973. It was clear at an early stage that the existence of a legally binding contract was in issue and that whether or not there had been mutual assent was a key element. Yet it was not until July 19 that Fairway asked for a continuance after it did nothing to obtain this evidence between May and July. In short, it was not diligent in seeking to present this evidence to the court in a timely manner.

The order and judgment of the district court is affirmed.

LAY, Circuit Judge (concurring).

Although I cannot concur in the majority's reasoning used to affirm the district court, I concur in the result reached.

I cannot accept the majority's reliance on the mutual assent doctrine. The authorized agents of both companies executed the same contract and regardless what they thought as to how the contract was to be construed they were bound by its actual terms. As stated in 1 Williston on Contracts, § 95, pp. 349–350 (3d ed. 1957):

It is often said broadly that if the parties do not understand the same thing there is no contract. But . . . it is clear that so broad a statement cannot be justified. It is even conceivable that a contract may be formed which is in accordance with the intention of neither party. If a written contract is entered into, the meaning and effect of the contract depends on the interpretation given the written language by the court. The court will give that language its natural and appropriate meaning.

**1144**

Nor do I agree that Mr. Dorman lacked authority to execute the agreement. If he lacked actual authority, which in my judgment he possessed, he nevertheless was cloaked with ostensible authority to execute the contract and that is all he needed. However, I agree with the result reached. The March 11, 1970 agreement required that before it was to become operative the contract had to be approved and ratified by both corporations. This never occurred. On this basis only, I would affirm the judgment of the district court.