**In re DR. C. HUFF COMPANY, INC., Debtor.**

**ALLIS–CHALMERS CORPORATION, Plaintiff,**

**v.**

**BORG–WARNER ACCEPTANCE CORPORATION, Defendant.**

**Bankruptcy No. 1–79–00271. Adv. No. 1–80–0046.**

United States Bankruptcy Court, W.D. Kentucky.

Nov. 7, 1984.

David W. Anderson, Bowling Green, Ky., for Allis-Chalmers Corp.

Philip Huddleston, Bowling Green, Ky., for Borg-Warner Acceptance Corp.

Henry Dickinson, Glasgow, Ky., Trustee and for Dr. C. Huff Co., Inc.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This well-aged adversary proceeding presents the court with a number of complex issues of state and federal law in the context of a simple lien priority dispute. Before venturing into the thicket of legal questions, however, we will review the stipulated facts of the controversy.

At all times relevant to this dispute, the plaintiff, Allis-Chalmers (AC), had a "floor plan" financing agreement with the debtor, Dr. C. Huff Co., Inc. (Huff), under which AC had a security interest in all machinery sold by AC to Huff and in "all proceeds derived therefrom."

On September 1, 1979, Huff sold farm equipment, covered by the AC/Huff security agreement, to Glendal Rennick. Rennick entered into an installment payment contract in order to purchase the equipment. Huff took a security interest in the equipment and filed a financing statement covering it on September 10, 1979. The defendant in this case, Borg-Warner Acceptance Corp. (BW), provided the financing for this purchase.

Pursuant to the terms of a retail finance agreement between Huff and BW, the Rennick contract was sold to BW on or about September 1, 1979. As consideration for this installment payment contract, BW paid Huff $7,211.56 and setoff $29,427.14 against a pre-existing debt owed BW by Huff.[1] BW's Indianapolis branch manager testified that, had it not been for the prior indebtedness of Huff to BW, BW would have paid Huff $36,638.70 for the contract.

█ The problem which we will address today is: who has the superior right to the $29,427.14 setoff, BW or AC? Four major legal issues must be addressed before we can answer this seemingly simple question.[2]

█ The initial issue to be considered is whether the priority of the parties to this fund is governed by the provisions of Kentucky's version of the Uniform Commercial Code (U.C.C.) or by the pre-code common law. We agree with the defendant that "the equitable right of setoff ... belongs to every creditor ..."[3] under Kentucky law. In this case, however, BW claims its interest in the setoff fund through its purchase of "chattel paper"[4] from Huff. AC

claims its interest in the funds via its interest in the chattel paper as proceeds of secured inventory.[5] U.C.C. 9–308, codified in Kentucky as KRS 355.9–308, clearly and directly governs priority disputes of this type. Therefore the priorities of the parties must be determined not by the common law rules of setoff, but rather by the express provisions of KRS 355.9–308.[6]

The second issue is whether BW's setoff of $29,427.14 against a pre-existing debt of Huff constituted "new value" for the purposes of KRS 355.9–308, which provides in part:

A purchaser of chattel paper who gives *new value* and takes possession of it in the ordinary course of his business has priority over a security interest in chattel paper which is claimed merely as proceeds of inventory subject to a security interest (KRS 355.9–306), even though he knows that the specific paper is subject to the security interest. (*emphasis added*).

The term "new value" has neither been directly defined in Kentucky's version of the U.C.C. nor by cases involving questions of priority under U.C.C. 9–308.[7] Therefore

1. The total payments due under the Rennick installment contract amounted to $58,581.10. The parties in their briefs have agreed that the value of the contract sold to BW by Huff was $36,638.70 at the time of sale.

2. The substantive commercial issues of this case have never been addressed by Kentucky's courts. Where there are no cases decided by the state courts on an issue, the Bankruptcy Court must anticipate the holding that would be made by the state court system if it were confronted with the issue. *Cole v. Cardoza* 441 F.2d 1337 (6th Cir.1971).

3. *Reliance Ins. Co. v. Commonwealth Dept. of Highways,* 576 S.W.2d 231, 235 (Ky.App.1978).

4. Chattel paper is defined in Kentucky Revised Statutes [KRS] 355.9–105(1)(b) as "a writing or writings which evidence both a monetary obligation and a security interest in or lease of specific goods". The retail sales contract in this case qualifies as chattel paper.

5. Under the provisions of KRS § 355.9–306(1) proceeds include whatever is received when the collateral is disposed of, including an "account arising when the right to payment is earned

under a contract right." The Retail Installment Contract at issue in this case is clearly a "proceed" of the sale of the secured inventory.

6. A similar result was reached by the Indiana Court of Appeals in *Citizens National Bank of Whitley County v. Mid-States Development Co., Inc.,* 177 Ind.App. 548, 380 N.E.2d 1243 (1978) where the court ruled that a priority dispute between a deposit/creditor bank which exercised its right to setoff and a secured party, was governed by the provisions of the U.C.C.

7. Some guidance to the meaning of the term "new value" may be found in U.C.C. 9–108 which gives three examples of what constitutes new value: making an advance, incurring an obligation and releasing a perfected security interest. In official comment number 2 to this section, the U.C.C.'s draftsmen state that "[in] other situations [than the three above mentioned examples] it is left to the courts to distinguish between 'new' and 'old' value". Few courts have ever considered this question. *In re Mary Grey Hosiery Mills, Inc.,* 20 U.C.C. Rep. 1060 (Bkrtcy.W.D.Va.1976); *Associates Discount Corp. v. Old Freeport Bank,* 421 Pa. 609, 220 A.2d 621 (1966).

we will look for guidance to the policies underlying both the Bankruptcy and Uniform Commercial Codes.[8]

The interrelationship of priorities between an inventory financer [in this case AC] and a discounter or factor of installment payment contracts [in this case BW] is carefully set out by the U.C.C. This interplay between BW and AC can be briefly summarized. AC sold farm equipment to Huff and took a perfected security interest by virtue of its security agreement and properly filed financing statements. When a buyer in the ordinary course of business purchased that equipment from Huff, that buyer took the equipment clear of AC's security interest.[9] Although AC no longer had a security interest in the equipment because of the sale, it did retain a security interest in the proceeds of the sale, in this case the installment sales contract.[10] Huff then sold the installment contract to BW. This sale would deprive AC of its security interest in the installment contract if it complied with the terms of KRS 355.9–308. Assuming *arguendo* that the sale complied with KRS 355.9–308, then the security interest of AC would shift again, this time to the proceeds from the sale of the installment contract to BW.[11]

■ If setoffs of pre-existing, unsecured debts were treated as new value for purposes of KRS 355.9–308, factors and discounters of accounts receivables and installment contracts would be given a position in bankruptcy superior to their fellow unsecured creditors as well as to holders of perfected security interests in inventory proceeds. Treating pre-existing debts as new value would also upset the precise interrelationship of priorities under the U.C.C. which was described above. Such preferential treatment of this class of financers would both greatly impair the value of inventory financers' security interests in proceeds [12] and significantly damage the fundamental principle of bankruptcy law that all unsecured creditors should receive equal treatment in the repayment of their debts. Therefore it is our opinion that a setoff of funds against a pre-existing debt does not constitute "new value" for purposes of KRS 355.9–308.

■ The final issue of substantive commercial law which we must address is the effect of BW's payment of $7,211.56 on the priorities of the parties to the setoff fund. This payment clearly constituted "new value" for the purposes of KRS 355.9–308. The question is whether this payment of new value gave BW priority to the entire fair market value (FMV) of the retail installment contract,[13] $36,638.70, or priority only to an amount equal to the cash which it paid for that contract.

In the *Mary Grey* case the court was confronted with an issue similar to the one present in this case and apparently concluded that since the funds paid for the accounts receivable were "advanced of record to Mary Grey's account" that new value was given and that the bank had priority to that chattel paper. The court was unclear in its reasoning on this issue and therefore its opinion on this question has little value as precedent. In the *Associate Discount* case the court only stated that a check given for the chattel paper constituted new value. Even the leading authorities on the U.C.C., Messers. White and Summer, give no guidance in this area. "The code nowhere defines 'new value' and there may be borderline cases in which it will be difficult to determine whether the purchases of the chattel paper give new value. Section 9–108 lists several forms of new value .... beyond [its] examples the courts are on their own". White & Summer, Uniform Commercial Code § 25–17 (2d ed. 1980).

8. The grammatical interpretation of the term new value seems to clearly indicate that an antecedent debt cannot be "new" value.

9. See KRS § 355.9–307.

10. See note 5, *supra.*

11. See *Associates District Corp. v. Old Freeport Bank*, 220 A.2d at 622 where the court gave a similar description of the priority relationship between a discounter and the holder of a security interest in proceeds.

12. The value of an inventory financer's interest in chattel paper is already greatly limited by the provisions of § 9–308. If an expansive definition is given to the term "new value", then the party claiming an interest in the chattel paper as inventory proceed will rarely, if ever, have priority over a purchaser of those notes.

13. See note 1, *supra.*

Principles of equity, as well as the rationale underlying the U.C.C. priority system, dictate that BW be given priority only to the extent of cash given to Huff.[14] If the advancement of only a small fraction of a chattel paper's FMV in new value gave a discounter priority to the entire FMV of the chattel paper, then any distinction between "new value" and other forms of value could be made meaningless by skillful financial planning.[15] Therefore, we express the opinion that a purchaser of chattel paper (who otherwise complies with the provisions of U.C.C. 9–308) has priority over a security interest in the paper as inventory proceeds, only to the extent of new value actually given.

\* \* \* \* \* \*

The reader will discern that thus far we have taken care to say that we are "expressing an opinion"; and, indeed, it is only that. Although counsel have vigorously contended for the bankruptcy court as their forum of choice to rule on an arcane point of commercial law,[16] we cannot accommodate them. Because of jurisdictional limitations we will describe we are unable to adjudicate with finality the controversy on its merits.

While in the past we have consistently refused to render purely advisory opinions, we have found it proper in this case to offer the foregoing judicial analysis which may—or may not—be of assistance to the state court to which these parties must inevitably turn. A sense of respect for the patience of these litigants during the inordinate pendency of this proceeding requires no less.[17] They are at least entitled to know that their cause has been seriously considered, even by a court powerless to act.

The constraints to which we have referred are so obvious, and our lack of authority to act so clear, that the losing party on the merits would become beyond question the prevailing party in an appeal on jurisdictional grounds.

The jurisdictional question facing the court is whether a federal bankruptcy court has the authority to hear a case of the type presently before the court, in light of the principles stated in the U.S. Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,[18] the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984,[19] and pre-*Marathon* case law.

Although neither party to this action has raised the question of this court's jurisdiction, it is a well-established rule that a question of jurisdiction may be raised at

---

**14.** In the context of the present action, this would mean that AC would be entitled to the entire disputed setoff fund of $29,427.14.

**15.** Our decision to give BW priority only to the extent of the amount of "new value" given is supported both by general principles of equity and bankruptcy case law. The situation in this case is analogous to that in a fraudulent transfer action where a purchaser has bought assets in good faith for less than equivalent value. There the good faith purchaser has the right to enforce his claim to the assets to the extent of the value given. *See* 11 U.S.C. § 548(c); §§ 9 & 10 Uniform Fraudulent Conveyance Act. *See also Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981); *In re Jones,* 20 B.R. 988 (Bkrtcy.Pa.1982).

**16.** There are no reported Kentucky decisions on the "new value" question, and few from elsewhere; see note 7 supra.

**17.** Under submission for 17 months, this case sets the record for decrepitude in the district, a distinction in which this writer takes no pride whatsoever. The case was originally presented to a predecessor judge, has since been a victim of judicial succession, and was permitted to languish through the jurisdictional confusion generated by the *Marathon* opinion, infra note 18.

**18.** 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598, 6 C.B.C.2d 785 (1982).

**19.** Section 122 of the Bankruptcy Amendments and Federal Judgeship Act of 1984 provides that the jurisdiction provision of the act are to take effect on the "date of enactment of [this act]". Apparently this means that the new jurisdictional provisions, save 28 U.S.C. 1334(c)(2), apply to all cases now pending before the bankruptcy including cases under submission but presently undecided. See note 27 *supra.*

any time by a federal court *sua sponte.*[20] In fact it is the duty of every federal court to raise this issue as a "threshold inquiry" in all federal proceedings.[21] It is immaterial that the parties have agreed to the jurisdiction of the court in this matter, for they cannot confer jurisdiction by agreement or waiver if it does not otherwise exist.[22]

Under the new bankruptcy amendments relating to jurisdiction, three separate classes of legal controversies can arise before a U.S. Bankruptcy Court: 1) "core" cases; 2) noncore related cases; and 3) noncore unrelated cases.[23] The extent of the Bankruptcy Court's jurisdiction is different in each class of cases.

Under the provisions of 28 U.S.C. § 157(b)(1) a bankruptcy court has the authority to both hear and decide only "core" proceedings which arise either under the bankruptcy code or from a case under the bankruptcy code. The term "core proceedings" is a new term of art, coined to describe the concept of foreshortened jurisdictional boundaries of bankruptcy courts. Only time and case law can bring the concept out of the chiaroscuro of new legislation into well-rounded and comprehensive definition. The new Section 157(b)(1) is an effort of definition by inclusion, listing fifteen separate types of actions and proceedings, of different procedural species but all generically springing from the *in rem* jurisdictional fundament of the 1984 Act.

■ Among those matters identified as "core proceedings" are "determinations of the validity, extent, or priority of liens", 28 U.S.C. § 157(b)(2)(K), into which the present controversy arguably could be fit. But such a categorization overlooks the necessity that we deal with *property of the estate* in entertaining such questions. Section 157(b)(2)(K) must be read as empowering us *only* to make "determinations of the validity, extent, or priority of liens upon property of the estate." Otherwise, we would be asserting a form of jurisdiction *ferae naturae,* capable of the rampant adjudication of property rights wherever found and by whomever owned.

■ We therefore conclude that the instant controversy is not a "core proceeding" under § 157(b)(2)(K) which allows our intervention. We will next consider whether we may rule on the case by characterizing it as a noncore but "related" proceeding.

Bankruptcy courts are given authority by the 1984 Act to hear noncore cases which are "related" to a bankruptcy proceeding. After hearing a related case a bankruptcy court must submit its findings of fact and conclusions of law to a U.S. District Court, for that court's entry of final judgment and possible de novo review. Although neither Section 157 nor Section 1334 of 28 U.S.C. gives a definition of what constitutes a related proceeding, the case of *Matter of Colorado Energy Supply, Inc.,*[24] from the Tenth Circuit Court of Appeals provides some guidance on the matter. In its opinion the court stated that: "Related proceedings ... are [those] adversary cases and controversies which are triable only by Article III Courts or State Courts ... [They] are traditional state common-law actions, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law".... [25]

■ In case at the bar we are confronted with a priority dispute between two

---

**20.** *In re Maine Marine Corp.,* 20 B.R. 426 (Bkrtcy.D.Me.1982); *In re Curtina,* 15 B.R. 993, 5 C.B.C.2d 1474 (Bkrtcy.S.D.N.Y.1981).

**21.** *Matter of Kutner,* 656 F.2d 1107 (5th Cir. 1981); *Save the Bay, Inc. v. United States,* 639 F.2d 1100 (5th Cir.1981).

**22.** *American Fire and Casualty Co. v. Finn,* 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951).

**23.** 28 U.S.C. §§ 157(b), (c) 1334(c).

**24.** 728 F.2d 1283, 10 C.B.C.2d 542 (10th Cir. 1984).

**25.** *Id.* at 1286, 10 C.B.C.2d at 544–45.

creditors of the debtor corporation.[26] Their conflict involves no issues of bankruptcy law, only questions of state commercial law which apparently have not been addressed by any Kentucky court. Neither under the 1984 Act nor according to pre-*Marathon* court decisions [27] does this case come within our reach. It does not involve either property of the debtor or property of the estate.[28] Any decisions by this court on the merits would have no effect whatsoever on any aspect of the debtor's bankruptcy proceeding. We are unable to find even the "peripheral relation" to the bankruptcy that the *Colorado Energy* test would allow. It is clear that controversies of this type fall within the classification of non-core, unrelated cases over which this court has no jurisdiction.

To summarize, our dismissal of this action for want of jurisdiction would obtain regardless of whether we view our own powers through the constricted lens of the 1984 Act, under the *Marathon* rule, or according to pre-*Marathon* case law dealing with "property of the estate". It follows that the length of time the case has been before the bankruptcy court has no bearing on its disposition.

In conclusion we hold that a bankruptcy court lacks the jurisdiction to either hear or decide private lien priority disputes between two creditors which do not directly or indirectly affect the debtor or his property. Finally, and in anticipation that the parties will resort to a state court as the proper forum, we hold that state statutes of limitation on an action between these parties on the subject matter of this lawsuit have been tolled by the pendency of the bankruptcy proceeding.[29]

Therefore it is ORDERED that the complaint of Allis-Chalmers Corporation be dismissed for want of jurisdiction. This is a final order.

**26.** By an agreed order dated October 16, 1984 the trustee, Henry Dickinson, was dismissed as a party to this action. Dickinson was an improper party to begin with, as a named defendant in what purported to be a preference claim, which of course can be brought only by the trustee as plaintiff. See *In re Bridges*, 31 B.R. 27 (Bkrtcy.W.D.Ky.1983).

**27.** *First State Bank and Trust Company of Guthrie Oklahoma v. Sand Springs State Bank*, 528 F.2d 350 (10th Cir.1976); *Associated Electrical Supply Co. of Omaha v. C.B.S. Electronic Sales Corporation*, 288 F.2d 683 (8th Cir.1961); *Central States Corp. v. Luther*, 215 F.2d 38 (10th Cir.1954); *In re Burton Coal Co.*, 126 F.2d 447 (7th Cir.1942). It is important to note that the Supreme Court's ruling in the *Marathon* case does not affect this case because it was commenced prior to the effective date of the *Marathon* decision which was to have only prospective application. See generally *In re Twin Parks Limited Partnership*, 720 F.2d 1374, 10 C.B.C.2d 564 (4th Cir.1983).

**28.** Even under this court's most expansive definition of "property of the estate", *In re Hurricane Elkhorn Coal Corp. II*, 19 B.R. 609 (Bkrtcy. W.D.Ky.1982), a pre-*Marathon* decision, the installment contract sold to BW by Huff does not constitute property of the estate. In the *Hurricane Coal* case, we found that the debtor retained an interest in property which it purportedly assigned to a creditor. In the present case the debtor completely divested itself of all legal and equitable interests in the sales contract. The only parties with claims to the fund in question are two of the debtor's creditors, AC and BW.

**29.** *In re Friedman*, 15 B.R. 493 (Bkrtcy.N.D.Ill. 1981) (courts may grant equitable relief from the running of statutes of limitation).