**In re OWENSBORO CANNING CO., INC., Debtor.**

**CONTINENTAL CAN COMPANY, INC., Plaintiff,**

**v.**

**OWENSBORO CANNING CO., INC., et al., Defendant.**

Bankruptcy No. 4–84–00074.
Adv. No. 4–84–0034.

United States Bankruptcy Court, W.D. Kentucky.

Feb. 19, 1985.

Michael A. Fiorella, Owensboro, Ky., for plaintiff.

Ronald J. Bamberger, Owensboro, Ky., for defendant.

William S. Reisz, Louisville, Ky., for Creditors' Committee.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

The issue we consider in today's opinion is whether the Continental Can Company, Inc., holds a valid security interest in the receivables, inventory and raw materials of the Chapter 11 debtor, Owensboro Canning Co., Inc. Our determination hinges in major part on the measurement of an "agreement letter" against applicable state law.

In August, 1983, Continental's management, increasingly concerned over unpaid bills of $183,506 owed to it by Owensboro Canning, sent its house counsel, William Christopher, to meet with the debtor company in Owensboro, Kentucky. Christopher was instructed by Continental to immediately file suit against the debtor unless satisfactory arrangements were made for payment of the debt, and carried with him a lawsuit ready for filing.

On the morning of August 16, 1983, Christopher and another Continental representative met with Ron Bamberger, counsel for the debtor, to discuss the debt. Christopher advised Bamberger of Continental's position and stated the terms which Continental would consider satisfactory for the repayment of the debtor's obligation. After intensive negotiations the parties agreed that the debtor would make a series of installment payments, with the total debt to be secured by certain property of the debtor. Due to the lateness of the day, the parties agreed to have the essential terms of their agreement reduced to writing in letter form the next day. Both parties intended that a more formal security agreement and promissory note would be drawn and signed at a later date.

Early on August 17, Christopher arrived at Bamberger's office to receive the agreement letter. At Bamberger's office was George Panagos, president of the debtor company, who signed the agreement letter for the debtor and gave Christopher the initial $10,000.00 payment as called for in the agreement.[1] Panagos also signed a financing statement which had been prepared by Bamberger. Christopher accepted both documents and properly filed the financing statement in the Daviess County Court Clerk's Office on August 17, 1983 before he returned to Continental's office in Connecticut.

After the signing of the letter agreement and the filing of the financing statement, the two parties exchanged several drafts of promissory notes and more formal security agreements which set forth considerably detailed provisions. None of the various drafts proved acceptable to both parties and none were ever signed. However, between August 17, 1983 and December 31, 1983, the debtor made the three $10,000.00 installment payments as required by the terms of the letter agreement.

In December of 1983, the debtor entered into a security agreement with another creditor, Heekin Can, Inc. That agreement provided in part:

(3) Debtor warrants that is is the owner of the Collateral, free and clear of all

---

1. The provisions for the debt's repayment were as follows:

In such regard we have conceptually agreed as follows:
1. Owensboro agrees to pay the above indebtedness to Continental on an installment basis consisting of $10,000.00 to be paid when this letter is co-signed by Owensboro; and

$10,000.00 to be paid monthly for three successive months; thereafter, $30,000.00 shall be paid each month commencing on the fourth month until the above indebtedness is paid in full with interest thereon at the rate of 1% above the monthly floating prime rate of First National Bank of Chicago, Chicago, Illinois.

liens and security interests *excepting only (1) the security interest of Continental Can Company, Inc., dated August 17, 1983 in the original amount of $183,450.18 respecting the Accounts Receivable, Inventory and Raw Materials, and (2) the security interest granted hereby;* that it has the right to make this Agreement, that the Collateral is used for business purposes and will be kept at the Debtor's address specified above.

(4) *Debtor agrees to remain current in the repayment of its indebtedness to Continental Can Company, Inc. and shall not incur any further indebtedness to Continental Can Company, Inc., which is, or may be superior to the security interest granted herein.* [Emphasis added].

Also in December of 1983, the debtor failed to make the $30,000.00 installment payment as required by the August 17, 1983 letter agreement. Continental wrote several letters to the debtor's counsel in an attempt to obtain compliance, but the debtor has failed to make any further payments on its obligation.

An involuntary Chapter 7 petition was filed against the debtor in March, 1984, and three weeks later Owensboro Canning was allowed to convert the case to a voluntary reorganization proceeding under Chapter 11 of the Bankruptcy Code. In its schedule of liabilities, Owensboro listed Continental as an unsecured creditor. Thus characterized, Continental promptly instituted the present action to determine the validity of its security interest.

\*    \*    \*    \*    \*    \*

■ This matter is properly before the court under its "core proceeding" jurisdiction of 28 U.S.C. § 157 which provides in part that:

(b)(1) Bankruptcy judges may hear and determine all core proceedings arising under title 11 ... and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

.    .    .    .    .

(k) determinations of the validity, extent, or priority of liens; [2]

The sole issue we decide today is whether the August 17 agreement letter constitutes a security agreement within the meaning of KRS 355.9–203. That section provides that a security interest is not enforceable unless there is a "security agreement" which is (1) in writing; (2) signed by the debtor, and (3) contains a description of the collateral. [3]

The term "security agreement" is defined by KRS 355.9–105(1)(h) as "an agreement which creates or provides for a security interest." KRS 355.1–201(3) defines an "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances ..."

According to the leading authorities on the Uniform Commercial Code, (U.C.C.), White and Summers, the language of the above sections of the U.C.C. requires a court to make two independent inquiries in determining whether a document or set of documents [4] constitute a valid security agreement. [5]

---

**2.** 28 U.S.C. § 157(b)(2)(K). This case is in contrast to *In re Dr. C. Huff Company, Inc.,* 44 B.R. 129 (Bkrtcy.W.D.Ky.1984), a Chapter 7 proceeding where two creditors attempted to bring a priority dispute before this court. In *Huff* we dismissed the priority action for lack of jurisdiction because the dispute bore no relationship to, nor had any effect on the debtor's bankruptcy. *See Id.* at 135. In the present case, Continental is pressing its lien validity action against the Chapter 11 debtor.

**3.** Specific words formally granting a creditor a security interest in the collateral are not required for a valid security agreement. *Matter of*

*Bollinger Corporation,* 614 F.2d 924 (3rd Cir. 1980); *In re Numeric Corporation,* 485 F.2d 1328 (1st Cir.1973).

**4.** *Matter of Bollinger Corporation,* 614 F.2d at 924; *In re Numeric Corporation,* 485 F.2d at 1328; *Nunnemaker Transport Co. v. United California Bank,* 456 F.2d 28 (9th Cir.1972); *In re Carmichael Enterprises, Inc.,* 334 F.Supp. 94 (N.D.Ga.1971), *aff'd per curiam,* 460 F.2d 1405 (5th Cir.1972).

**5.** *See* J. White & R. Summers, Uniform Commercial Code, Section 23–3 at 904 (2nd ed. 1980).

First, a court must resolve, *as a question of law,* whether the language embodied in the writing [6] *objectively* indicates that the parties *may have intended* to create or provide for a security interest. The standard for crossing this objective threshold is not particularly high,[7] and is easily passed by the August 17th letter. The letter provides that:

> [W]e have conceptually agreed as follows:

> The indebtedness shall be evidenced by an installment note secured by a lien on all accounts receivable, inventory and raw materials now or hereafter existing which shall be perfected by a UCC–1 statement to be filed upon the signing of this letter and evidenced by a standard form financing statement....

> When signed by my client, George Panagos ... as President of [Owensboro Canning Company, Inc.], this letter will form the basis for our preparing a financing statement.[8]

This language clearly indicates that Owensboro Canning intended to grant Continental a security interest in its account receivable, inventory and raw materials.

The second inquiry a court must make is whether the parties *actually intended* to create a security interest.[9] In this case the parties agree that they always intended to create a security interest. The precise issue we address is the matter of timing; that is, whether the parties intended to presently create a security interest with the August 17 letter agreement, or whether, contrarily, they intended at some later date to agree in a formal and highly detailed document.

A sizeable portion of Owensboro Canning's argument against the validity of Continental's security interest revolves around Continental's alleged intent as to the August 17 letter. The debtor contends that: "Continental did not assume that a valid security agreement was in force with the August [17], 1983 letter...." It supports this contention by producing a subsequently prepared note and security agreement sent to Owensboro Canning by Continental as evidence of Continental's intentions toward the August 17 letter. We cannot accept the argument. While it is true that Continental's actions could be construed as the actions of an unsecured company attempting to achieve secured status, we believe the explanation offered by Continental to be more indicative of its intent. The evidence, including the uncontroverted testimony of house counsel William Christopher, indicates that Continental insisted upon a security arrangement with Owensboro Canning on August 17, 1983 with the signing of the letter agreement as an alternative to filing suit. Continental perceived the letter agreement as an informal but binding security agreement, even though it could have been buttressed later

---

**6.** Parol evidence is not admissible to establish the statutory requirements of the security agreement. *In re Delta Molded Products, Inc.,* 416 F.Supp. 938 (N.D.Ala.1976); *In re E.F. Anderson & Son, Inc.,* 12 U.C.C. 567 (Bkrtcy.M.D.Ga.1973).

**7.** *In re Amex-Protein Development Corp.,* 504 F.2d 1056 (9th Cir.1974); *In re Trucker's International Inc.,* 17 U.C.C. 1337 (Bkrtcy.W.D.Wash. 1975); *Komas v. Small Business Administration,* 71 Cal.App.3d 809, 139 Cal.Rptr. 669 (Cal.1977).

**8.** Owensboro Canning claims that the term "financing statement" used in August 17 letter was a mistake and that the parties really meant "security agreement" at every place that term

was used. We cannot accept this argument. It is an ancient maxim of contract construction that ambiguities in an agreement must be construed against its drafter. The references to the financing statement, a companion document to a security agreement, further support the intent that the letter itself was a valid present agreement. *In re Barker,* 40 B.R. 356 (Bkrtcy.Minn. 1984); *In re Maxwell,* 30 B.R. 982 (Bkrtcy.N.D. Ill.1983); *In re Dublin Properties,* 27 B.R. 506 (Bkrtcy.E.D.Penn.1983).

**9.** This is a factual determination, White & Summers, *supra* note 5 at Section 23–3, p. 905, and therefore subject to the "clearly-erroneous" standard of review. *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984); *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983).

with a "boiler-plate" document. We perceive the letter in that same way. We therefore hold that Continental intended to enter into a security agreement with Owensboro Canning when it received the August 17, 1983 letter agreement, and filed the financing statement, both of which were prepared and signed by the debtor.

The remainder of Owensboro Canning's argument concerns its own intent concerning the August 17 letter agreement. The debtor correctly states that: "The burden [of proof] is on the creditor to establish the intention [of the debtor]" and argues that they did not intend the August 17 letter to be a security agreement. However, we are of the opinion that the great weight of evidence [10] indicates that the *objective* intent of Owensboro Canning was to enter into a security agreement on August 17.[11] Initially we note, and in so doing paraphrase applicable state law, that the letter was (1) in writing, (2) signed by the debtor, and (3) contains a description of the collateral.

The wording of the August 17 letter indicates the debtor intended to grant Continental a security interest in its inventory, accounts receivable, and raw materials. The language of the letter also reveals that Owensboro Canning intended that the August 17 letter serve as an informal security agreement until a suitable, formal replacement was agreed upon. Further, the debtor, contemporaneously with the drafting of the agreement letter, prepared and signed a financing statement which it delivered to Continental for filing. Thereafter, the debtor made four $10,000.00 payments to Continental as called for in the agreement letter. Finally, in December, the debtor acknowledged in its dealings with the Heekin Can Company that Owensboro Canning's accounts receivable, inventory and raw materials were subject to the security interest of Continental.

The evidence taken as a whole easily demonstrates that Owensboro Canning intended to enter in a secured transaction with Continental on August 17, 1983 and that the "letter agreement" of that date was to stand as proof of that transaction.

In conclusion we reflect on draftsmanship as an art form. Seasoned commercial lawyers negotiating in a crisis atmosphere are likely to carefully deal with those niceties of punctuation, emphasis, verb form and tense which, when exactly drawn, can transform a statement of future intention into a binding present commitment. To the lawyer/writer, nothing assures the selection of *le mot juste* quite like the editorial veto power of opposing counsel armed with an unfiled but potentially devastating lawsuit. The letter here in question was so prepared, and was artful enough to prevent the filing of a lawsuit and to permit the formal recording of its derivative and companionate document, the financing statement. It speaks more persuasively than

---

**10.** Even assuming the admissibility of Bamberger's parol evidence, *see* note 6 *supra,* we do not question either the honesty or accuracy of that testimony. When Bamberger testified as to the intent of Owensboro, he spoke as an insider about their subjective intent, and in support of the position being taken by his client in the immediate context of the courtroom. As stated in note 11, *infra* the subjective intention of a party is ordinarily irrelevant in determining whether the parties assented to a contract. *Fairway Center Corp. v. U.I.P. Corp.,* 502 F.2d 1135 (8th Cir.1974).

**11.** For more than a century the "objective theory" of contracts has been dominant. It stresses the outward manifestation of assent made to the other party in contrast to the older "subjective theory" which stressed the mental assent of the parties to a contract. Williston, Freedom of Contract, 6 Cornell L.Q. 365 (1921). Perhaps the best statement of the modern objective theory of contracts was made by Judge Learned Hand when he wrote:

A contract has, strictly speaking, nothing to do with the personal or individual, intent of the parties. A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. *Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

the testimony which denies it, and this court gets the message.

ACCORDINGLY, we hold that Continental Can Company, Inc. has a valid security interest in the accounts receivables, inventory and raw materials of the debtor Owensboro Canning Company, Inc. IT IS SO ORDERED, and this is a final order.